MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2021 ME 43
Docket:        Yor-20-314
Argued:        June 3, 2021
Decided:       September 14, 2021

Panel:         MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

BRUCE AKERS

PER CURIAM

[¶1] Bruce Akers appeals from a judgment of conviction of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2021), entered in the trial court (York County, *Douglas, J.*) following a jury trial. He argues that the court erred when it denied his motion to suppress physical evidence and statements that were obtained in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and article I, sections 6 and 6-A of the Maine Constitution. We agree with Akers and vacate the judgment and remand for further proceedings.

## I. BACKGROUND

[¶2] Viewing the evidence in the light most favorable to the court's order on the motion to suppress, the record supports the following facts. *See State v. Prescott*, 2012 ME 96, ¶ 2, 48 A.3d 218.

[¶3] On June 9, 2016, Akers called his local sheriff's office and spoke with a sergeant. Akers reported that he was missing some items and suspected that his neighbor had stolen them; Akers rejected the sergeant's offer to come out to his property. On June 10, at around 6:45 p.m., the sergeant learned that Akers's neighbor—whom we will refer to as "the victim"—had been reported as missing. The sergeant and a deputy went out to the victim's home and spoke with multiple family members. The officers learned that the family had been unable to contact the victim since the evening before and were worried because he had been depressed and possibly suicidal. The victim's daughter reported that he and Akers had a longstanding feud related to their properties.

[¶4] The sergeant and deputy searched the victim's house and conducted a grid search of the surrounding woods; in doing so, they came within sight of the abutting properties owned by Akers and another neighbor. The victim and Akers shared a common driveway near the road, but the driveway eventually split off onto their respective properties. Where the driveway split off toward

Akers's property, there was a sign reading "Private Driveway Please Do Not Enter."

[¶5]   After walking the victim's property, the officers walked along a footpath through brush to Akers's property and called out for Akers but received no response.  The path led them to two structures—a red trailer and a white camper—close to one another and surrounded by piles of scrap metal and other materials.  A red truck was parked in the driveway.  The sergeant heard a noise coming from the camper but the noise stopped; he noticed that the camper was padlocked from the outside and had a tarp hanging over the door.  He knocked on the door and no one responded, and he peered in through a window but could not see anything.

[¶6]   Meanwhile, the deputy inspected the red trailer and noticed that it was also padlocked from the outside; he looked inside but could not see anything.  The sergeant knew that Akers raised dogs, so he and the deputy walked down another footpath to look for the dogs, thinking that Akers might be with the dogs, and they continued to call out for Akers.  They found the dogs alone, so they returned to the trailer and camper.  Although the sergeant thought that he heard a noise, similar to the noise he had heard before, coming

4

from the camper, the deputy did not hear it. The officers returned to the victim's property, put police tape on the door, and left to attend to other calls.

[¶7] Approximately five hours later, just after midnight on June 11, the sergeant and deputy returned to check on the victim's property, where they encountered an upset family member. After they called another officer for assistance, and also called the family member's girlfriend to pick him up, the family member left. The officers noted that the police tape was still intact, indicating that the victim had not returned. Next, the three officers walked to Akers's property along the footpath using flashlights to light the way, announcing their presence and calling out for Akers. The officers heard no response, but saw that the red truck was still parked in the driveway.

[¶8] The sergeant again heard a noise coming from the camper, but this time it was a loud "thud" that the sergeant testified sounded like it was made by "something bigger than any small animal" and may have been caused by a person. The deputy also heard the noise. At this point, the officers did not know that the sound came from Akers, they had not located the victim, and the door was still padlocked from the outside. The sergeant and officer were at the front of the camper where there was a large window with a hinged cover over the window. They lifted the cover and shined a flashlight to illuminate the interior

of the camper.  The sergeant saw a person in a sleeping bag inside the camper begin to get up.

[¶9]  The sergeant recognized the man inside as Akers; he called Akers by name, identified himself, told Akers "I need to talk to you," and asked Akers to come outside.  Akers acceded to the directive to come outside and talk but told the officers that he first needed to get dressed and gather some items and told them he was unarmed.  Akers was unable to find the keys to unlock the padlock and said he would have to force the door open by prying it with a hammer from the inside.  After that attempt proved unsuccessful, Akers asked the sergeant to help, and the sergeant successfully pried off the padlock.  The officers lifted the tarp from the door and Akers came outside.

[¶10]  At this point, the sergeant initiated an audio recording with his cell phone.  He asked Akers which way Akers wanted to go and used the flashlight to light the way to a flatbed trailer.  Akers sat down on the trailer, and the sergeant sat next to him as the other two uniformed officers remained standing about ten feet away.  Portions of the exchange are as follows:

- The sergeant asked, "Bruce, where can we have a seat and talk for a minute?  We got some business to take care of, right?" Akers responded, "I guess so."

- The sergeant asked if he knew why they were there, and Akers replied, "Yeah. Probably. Yeah."

- The sergeant asked, "Where is he?" Akers did not respond, so the sergeant asked, "Can I ask you something?" and Akers said, "Yeah."

- The sergeant asked, "Is he alive?" and Akers shook his head no. The sergeant followed up, "Can you bring us to him?" and Akers said, "I can."

- The sergeant told Akers they would not ask any more questions and asked Akers to stand to be searched for weapons.

- Akers stated, "The guy just wouldn't leave me alone."

[¶11] The sergeant told Akers they were going to take him to the police substation where an investigator would speak further with him. The sergeant read Akers his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and confirmed that Akers understood. After that, Akers stated that he did not want to answer any questions. The sergeant and the deputy left to retrieve their car while the other officer stayed with Akers. While the others were gone, the remaining officer initiated a conversation with Akers:

- The officer stated, "We'll get you through this, man, I promise, OK?" to which Akers responded, "Yep. Thank you. It's nothing I wanted to ever happen. I'm the most peaceful guy you ever met."

- The officer said, "Sometimes people put situations in our court and we have no choice but to . . . how we handle them. I get it. I totally get it."

The sergeant and deputy returned with the car, and Akers and the deputy sat in the backseat.

[¶12] At one point, Akers said, without prompting, "It's not the best day of my life." During the car ride, the three discussed Akers's dogs and what they might need. Then Akers said, again without prompting, "I actually would have called you guys right away but I wanted a few hours of freedom, and [to] enjoy it. I can't say that I enjoyed it that much . . . ." After they arrived at the substation, a detective came and read Akers his *Miranda* rights again, and Akers asked for a lawyer before answering questions.

[¶13] Later that morning, a search warrant authorizing a search of Akers's residence, property, and vehicles was issued based on an affidavit prepared by the detective. The affidavit relied in part on statements Akers made to the officers. A search of Akers's property resulted in the discovery of the victim's body and a machete with traces of the victim's blood on it.

[¶14] A grand jury indicted Akers for intentional or knowing murder in violation of 17-A M.R.S. § 201(1)(A). Akers filed a motion to suppress, asserting that evidence, including the statements he made to the officers after exiting the

8

camper, had been unlawfully obtained as a result of the officers' warrantless search of his property. At the motion hearing, both the sergeant and the deputy testified. The court admitted in evidence a map depicting the victim's and Akers's properties, the search warrant affidavit, the evidence log, a portion of the June 11 audio recording, and several photographs of Akers's property.

[¶15] On April 2, 2019, the court denied Akers's motion to suppress. The court determined that the searches around 7:00 p.m. on June 10 and midnight on June 11 were not unreasonable, that suppression would not be justified even if they were, and that Akers's statements were made voluntarily. It also determined that the emergency aid doctrine supported the searches because the officers were looking for a missing person, believed Akers might have had pertinent information, and heard a noise inside the camper that was reasonable to investigate. Moreover, the court concluded that, even if the searches were unlawful, suppression was not justified because it would not serve the purposes of the exclusionary rule.

[¶16] Next, with respect to Akers's arguments that his statements should be suppressed, the court determined that he was not in custody when he made the first statements to the sergeant upon leaving his camper, that his later statements after he was in custody were made spontaneously, and that his

statements were not the product of coercive or deceptive practices by the officers. The court also concluded that, even if Akers had been in custody at the time of the initial statements, the questions did not violate *Miranda* because they fell within the public safety exception. Finally, it concluded that based on the totality of the circumstances Akers's statements were made voluntarily.

[¶17] In December 2019, Akers filed a motion for sanctions and to reopen the suppression hearing. He argued that the State failed to disclose potential impeachment information about the three officers who came to his property on June 11, as well as a fourth officer involved in the investigation, in violation of its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Akers highlighted an email the sergeant wrote to other officers regarding the suppression hearing. He requested access to personnel records, internal affairs investigation records, sealed exhibits from a Maine Labor Relations Board case, and correspondence regarding the truthfulness of the officers. He also asked to reopen the suppression hearing to cross-examine the testifying officers regarding their truthfulness.

[¶18] Only the email correspondence is relevant to this appeal. In 2017, the sergeant sent an email to other officers to schedule a meeting to "prep

together" for a hearing on the motion to suppress in this case. The sergeant's email included links to webpages discussing *Miranda* and the Bill of Rights "as a reminder," and stated, "If the defense wins this the entire case could get dismissed."

[¶19] The court held a nontestimonial hearing on Akers's motion for sanctions and to reopen the suppression hearing, and ultimately denied the motion in relevant part. It determined that most of the requested information was not material subject to *Giglio*; some information might be subject to disclosure depending on how the State proceeded; and finally that the sealed exhibits would be submitted for *in camera* review.

[¶20] Regarding the sergeant's email, the court found that no meeting had occurred between the officers and that "[t]here [was] no basis in the record before the court to support a different conclusion," and thus the email did not amount to *Giglio* material. Its finding was based on an affidavit from the sergeant. Moreover, orally on the record at the motion hearing, the court stated that "[a]ny inconsistencies between the [police] reports and [the officers'] testimony at the suppression hearing would have . . . and could have . . . and most likely was, to some extent, explored at that hearing through cross-examination. Counsel had all that information."

[¶21]  After a five-day trial in January 2020, a jury found Akers guilty of intentional or knowing murder.  In November 2020, the court sentenced him to thirty-eight years' imprisonment.  Akers timely appealed from the judgment. *See* 15 M.R.S. § 2115 (2021); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

### A.    The Searches

[¶22]  Akers argues that the trial court erred when it denied his motion to suppress based on the Fourth Amendment to the U.S. Constitution.  He claims that the officers twice conducted illegal, warrantless searches: first when they entered the curtilage of his home around midnight on June 11, and again moments later when they lifted the window cover on his camper to peer inside. He asserts that the fruits of these unlawful searches, including his statements and the physical evidence later discovered, should be suppressed because their discovery was not attenuated from the violation of his rights.  The State argues that the officers' entry into Akers's curtilage was lawful and that the emergency aid doctrine permitted them to lift the window cover on the camper.

[¶23]  We apply two standards of review to the denial of a motion to suppress; we review the factual findings for clear error and the legal issues de novo.  *State v. Cote*, 2015 ME 78, ¶ 9, 118 A.3d 805.  Where, as here, the facts

12

are not in dispute, we review the court's denial of a motion to suppress de novo. *State v. Bennett-Roberson*, 2019 ME 49, ¶ 9, 206 A.3d 303.

[¶24]  The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "The very core of this guarantee is the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596, 1599 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).  This protection extends to the curtilage of a home. *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663, 1670 (2018).

[¶25]  A violation of the Fourth Amendment occurs when a search by the government "violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Jardines*, 569 U.S. at 5 (quotation marks omitted).

[¶26]  The language of the Fourth Amendment expressly requires that all searches and seizures be reasonable and that any warrants permitting searches be based on probable cause and be limited in scope.  *Kentucky v. King*, 563 U.S. 452, 459 (2011).  The Fourth Amendment does not explicitly state when a search warrant must be obtained, but the United States Supreme Court has "often said that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (quotation marks omitted)*.*  Nonetheless, the Court has also recognized that "the ultimate touchstone of the Fourth Amendment is reasonableness." *Id.* (quotation marks omitted).  "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Riley v. California*, 573 U.S. 373, 382 (2014).

[¶27]  As an initial matter, it is clear that the officers' actions amounted to a warrantless search of Akers's property because their entry into the curtilage of his home and thereafter lifting the window cover were intrusions into areas where Akers had a subjective expectation of privacy that society would recognize as reasonable.  *See Kyllo*, 533 U.S. at 33.  However, the Fourth Amendment proscribes only *unreasonable* searches, *see* U.S. Const. amend. IV; *King*, 563 U.S. at 459, and thus we must consider whether those

14

searches were unreasonable, and, if so, whether suppression of the evidence is warranted.

### 1. Curtilage

[¶28] The circumstances of the officers' visit to Akers's property were unusual and concerning: three officers arrived in the middle of the night, followed a footpath rather than walking up the driveway, and did not immediately attempt to knock on the door to the camper to contact Akers. We conclude that this conduct, absent a warrant, was not reasonable. The officers were investigating a missing person who, importantly, lived elsewhere, and there is no explanation for why the officers took a footpath around midnight in order to have a conversation with the missing person's neighbor. They could have waited until the morning and come down the driveway to knock on Akers's door to speak with him, especially given that the officers had left the missing person's home to address other matters for several hours earlier that day. The time delay also suggests that, had they had probable cause to believe that searching Akers's property would provide information about criminal activity, the officers had ample time to obtain a warrant. It is further unclear why they did not approach the door of the camper and knock in their efforts to reach Akers, but instead approached from different sides of the camper.

Considering the circumstances objectively, we conclude that the officers conducted an unlawful and unreasonable search of the curtilage of Akers's home.

[¶29] The State argues that the officers' entry into Akers's curtilage was reasonable, asserting that their actions were an extension of their search for a missing person, which included an attempt to speak with Akers about his missing neighbor.

[¶30] Two analogous cases show that the officers' actions in purportedly searching for a missing person were unreasonable. In the first, the United States Supreme Court held that officers may not ordinarily search the home of a third party when executing an arrest warrant. *See Steagald v. United States*, 451 U.S. 204, 220-22 (1981). In the second, the Massachusetts Appeals Court determined that the emergency aid doctrine did not apply where officers entered the apartment of a missing woman. *Commonwealth v. Bates*, 548 N.E.2d 889, 890-93 (Mass. App. Ct. 1990). In that case, the police received a report of a missing person and more than three hours later officers went to her apartment to look for her. *Id.* at 891. There was no response when they knocked on the door but hearing the television on inside, and finding that the door was unlocked, they let themselves in. *Id.* Upon entry, they saw the

defendant lying on the couch on top of a handgun and ammunition. *Id.* He was subsequently convicted on charges of unlawful possession of a firearm and ammunition. *Id.* at 890. The court determined that the passage of time plus the lack of a reason for the officers' failure to obtain a warrant prevented the application of the emergency aid doctrine. *Id.* at 892.

[¶31] The circumstances here, where the officers were not searching the property of the missing person and were not looking for the missing person—recall that they were calling out for Akers—present a stronger case that the search of Akers's curtilage was unreasonable. Officers are not permitted to enter upon and conduct a warrantless search of property that they would otherwise be unlicensed to enter merely because they are trying to locate a missing person.

[¶32] We also reject the State's argument that the officers' entry was supported by an implied invitation because they used a "recognized access route[] reasonable under the circumstances." *State v. Trusiani*, 2004 ME 107, ¶ 17, 854 A.2d 860 (quotation marks omitted). In fact, when entering onto Akers's property, the officers used a footpath between the two private properties. Their entry occurred after Akers had expressly declined an offer from the sergeant to come out to his property during their June 9 phone call

and there were no indications that visitors were welcome at the property—rather, a sign on Akers's driveway read "Private Driveway Please Do Not Enter." Likewise, their entry cannot be justified as a so-called "knock-and-talk" because they did not approach and knock on the door to request to speak, and their conduct amounted to "more than any private citizen might do." *King*, 563 U.S. at 469-70. The State concedes that the officers' actions cannot be justified by the exigent circumstances doctrine because they lacked probable cause. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

[¶33] Because the officers had no warrant and because no exceptions to the warrant requirement apply, the search of Akers's curtilage was unreasonable. *See Riley*, 573 U.S. at 382. We next consider whether the officers' lifting of the window cover was also a violation of Akers's Fourth Amendment rights.

### 2. Window Cover

[¶34] For the same reasons discussed above with respect to the entry into the curtilage, the officers' lifting of the window cover was a warrantless search. Thus, unless some exception to the warrant requirement applies, their conduct must be viewed as a violation of Akers's constitutional right to be free from unreasonable searches.

[¶35] Akers asserts that no exception to the warrant requirement exists and that it was unreasonable for the officers to lift the window cover to allow them to peer inside his home. The State argues that the officers' actions were not unreasonable and that they were permitted to gaze into the otherwise private space pursuant to the emergency aid doctrine.

[¶36] "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 390, 403 (2006). However, officers cannot rely on the emergency aid doctrine when they are not lawfully within the area where the alleged emergency arises. *See King*, 563 U.S. at 462-63. "Th[e] emergency aid exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (alterations, citations, and quotation marks omitted).

[¶37] After the officers completed their unprivileged entry into the curtilage of Akers's home for the purpose of questioning him, and not for the purpose of conducting a visual search for the victim, they heard a thud from

inside the camper. At that time, the officers were aware of the following information: the camper was padlocked from the outside, the victim was still missing, and Akers and the victim had a somewhat contentious relationship at times.

[¶38] The only fact at that time giving rise to the alleged emergency was the sound of a thud—a sound that is generally not unusual coming from inside a residence or other structure, and does not, by itself, suggest the existence of an emergency. The officers did not observe an altercation or injured person inside, and did not describe the sound as any sort of a cry for assistance. *See, e.g., Fisher*, 558 U.S. at 48; *Brigham City*, 547 U.S. at 406. We conclude that the officers did not have an objectively reasonable basis for believing that a person inside the camper needed immediate aid. *See Fisher*, 558 U.S. at 47. Accordingly, the officers' act of lifting the window cover and looking inside was not justified by the emergency aid doctrine and therefore was an unreasonable search under the Fourth Amendment.

### 3. Suppression

[¶39] Having determined that the officers acted unreasonably in searching Akers's home and curtilage, we must decide whether suppression of the evidence was warranted. Akers argues that the statements he made to the

officers after exiting his camper as well as the later physical evidence discovered after a warrant was obtained to search his property should be suppressed.

[¶40]  "The exclusionary rule . . . excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights.  Fruits of such evidence are excluded as well."  *Alderman v. United States*, 394 U.S. 165, 171 (1969) (citations omitted).  The exclusionary rule "is a prudential doctrine created by th[e] [United States Supreme] Court to compel respect for the constitutional guaranty."  *Davis v. United States*, 564 U.S. 229, 236 (2011) (citation and quotation marks omitted).  The rule's purpose "is to deter future Fourth Amendment violations," and it will be applied "to situations in which this purpose is thought most efficaciously served."  *Id.* at 236-37 (quotation marks omitted).  Exclusion may effectively "compel respect for the constitutional guaranty," but we also must consider "the substantial social costs" of exclusion, both on "the judicial system and society at large."  *Id.* (quotation marks omitted)*.*  "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."  *Id.* at 237.

[¶41]  In *Brown v. Illinois*, the United States Supreme Court discussed at length the application of the exclusionary rule.  422 U.S. 590 (1975).  It

explained that *Miranda* warnings preceding a defendant's statement do not necessarily, and cannot alone, purge the taint of an illegal search or seizure under the Fourth Amendment but that such warnings are "an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest." *Id.* at 602-03. Rather, "[t]he voluntariness of the statement is a threshold requirement," and then courts must consider "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603-04 (citation and footnotes omitted).

[¶42] Here, the court erred when it determined that suppression of evidence obtained as a result of the investigatory search of Akers's curtilage and camper was not warranted. All three of the *Brown* factors support suppression of Akers's confession, as well as the searches. Certainly there is close temporal proximity between the searches and the statements Akers made to the officers—only a matter of minutes passed between the searches and the original statements, which formed part of the basis for the issuance of the search warrant. Likewise, there were essentially no intervening circumstances: the officers intruded upon Akers's curtilage and peered inside his home and instructed him to come out and speak with them. Akers complied and made the

22

incriminating statements in response to questions posed by the sergeant. He was immediately taken to a substation where he was interviewed by a detective whose affidavit supported the issuance of the warrant to search Akers's property.[1] The entire sequence of events during which Akers made the inculpatory statements—from leaving his home until he arrived at the substation—took less than thirty minutes.

[¶43] The third factor also favors suppression. "The exclusionary rule exists to deter police misconduct" and "favor[s] exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2063 (2016). There is significant deterrence value in this case because the officers entered upon Akers's posted property on repeat occasions—he had told a sergeant the previous day that he did not want officers coming to his property—over the course of their investigation of a missing person who did not live on Akers's property. Without explanation, they again entered upon his property around midnight and searched his property for investigatory purposes.

[¶44] To be sure, the societal and judicial costs of suppression are significant here. If the officers' conduct in conducting nonconsensual

---

[1] Akers made no additional inculpatory statements to the detective at the substation.

investigatory searches of Akers's curtilage and camper without probable cause after midnight and insisting on Akers coming out of his residence to be interviewed was not flagrant, it was undoubtedly purposeful and it cannot be excused, and the deterrence benefits outweigh the costs of suppression. *See Davis*, 564 U.S. at 237. We therefore conclude that suppression was warranted under the circumstances, and the court erred when it denied Akers's motion on this ground.

**B.     Voluntariness of Statements**

[¶45] A separate ground for suppressing evidence of Akers's inculpatory statements, apart from the searches, is that they were not voluntary. Akers asserts that the trial court erred when it denied his motion to suppress based on the Fifth and Fourteenth Amendments to the U.S. Constitution and sections 6 and 6-A of article I of the Maine Constitution. He asserts that the court misapplied the law and that the totality of the circumstances favors suppressing his statements because they were involuntary.

[¶46] "A confession is admissible in evidence only if voluntary." *State v. Coombs*, 1998 ME 1, ¶ 10, 704 A.2d 387. "The determination of whether a statement is voluntary is a mixed question of fact and law, such that the court's factual findings are reviewed for clear error and its application of legal

principles to those findings is reviewed de novo." *State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595. "Although findings of fact are reviewed deferentially, the application of legal principles to those findings is reviewed independently." *Coombs*, 1998 ME 1, ¶ 8, 704 A.2d 387. Accordingly, "the dispositive issue of the voluntariness of a confession, although based on all the facts and circumstances surrounding the confession, is a legal issue warranting independent appellate review." *Id.* ¶ 9.

[¶47] The Maine Constitution requires the State to meet a higher standard for demonstrating voluntariness than does the federal constitution. *See State v. Rees*, 2000 ME 55, ¶¶ 5-7, 748 A.2d 976; *see also* Me. Const. art. I, §§ 6, 6-A; U.S. Const. amends. V, XIV, § 1. The Maine Constitution reflects "the primacy of the value . . . of safeguarding the right of an individual . . . not to be compelled to condemn himself by his own utterances." *Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976 (alteration and quotation marks omitted). Based upon this higher standard, the State has the burden to establish beyond a reasonable doubt that Akers's statements were voluntary. *State v. Carrillo*, 2021 ME 18, ¶ 14, 248 A.3d 193.

> To be voluntary, a confession must be the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct. In deciding whether a statement was voluntary, we consider the totality of the circumstances, including both external

and internal factors, such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*Bryant*, 2014 ME 94, ¶ 16, 97 A.3d 595 (citation and quotation marks omitted).

[¶48] Considering the totality of the circumstances, *see id.*, we conclude that the State has failed to establish beyond a reasonable doubt that Akers's self-incriminating statements were made voluntarily. The court found that Akers's statements were voluntary because he presented in the audio recording as "alert, composed, stable, aware of his situation, and oriented to time and place." The court's findings, however, neglected to consider that three officers approached Akers after midnight, after having visited his property multiple times over the course of the day, peered into his home, and roused him from his sleeping bag. Although Akers was in a familiar and noncustodial setting, there were three uniformed and armed officers outside his home in the middle of the night, one of whom was directing him to come outside. *See id.* ¶ 17. The court failed to take account of the lateness of the hour and the manner of his awakening. *See Kaupp v. Texas*, 538 U.S. 626, 631-33 (2003) (explaining that officers "rousing an adolescent out of bed in the middle of the night with the

words 'we need to go and talk'" favored suppressing the defendant's confession); *United States v. Reeves*, 524 F.3d 1161, 1168-69 (10th Cir. 2008) (stating that the time of a police encounter being between 2:30 and 3:00 in the morning "must be taken into consideration when analyzing the coerciveness of the encounter"); *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (recognizing that "police encounters at a person's dwelling in the middle of the night are especially intrusive" and that there is a "special vulnerability of the individual awakened at the privacy of his place of repose during the nighttime hours to face a nocturnal confrontation with the police").

[¶49] Furthermore, the sergeant's line of questioning—"We got some business to take care of, right?"; "You know why we're over here, right?"; "We gotta find him"; "Where is he?"; "Is he alive?"—was pointed from the very outset. The sergeant was not inquiring if Akers had seen the missing person or knew where he was. Rather, his questions were predicated from the beginning upon the assumption that Akers knew where the victim was located. While the sergeant eventually provided *Miranda* warnings, they came only after the officers had elicited incriminating statements from Akers. *See Bryant*, 2014 ME 94, ¶ 16, 97 A.3d 595. Thus, the court erred when it found that that the totality of the circumstances supported a determination beyond a

reasonable doubt that Akers's statements were the free choice of a rational mind, were fundamentally fair, and were not a product of coercive police conduct. *See id.*

[¶50] Finally, it is clear that the court's errors in denying Akers's motion to suppress were not harmless given that the search warrant was granted in part on Akers's statements, which were obtained as a result of the officers' illegal searches and were made involuntarily, and that those statements were presented to the jury. *See State v. Fleming*, 2020 ME 120, ¶ 34, 239 A.3d 648 ("A constitutional error made at trial may be deemed harmless if we are satisfied beyond a reasonable doubt, based on the trial record as a whole, that the error did not contribute to the verdict obtained." (quotation marks omitted)). Accordingly, Akers's conviction must be vacated.[2]

The entry is:

> Judgment of conviction vacated. Remanded for further proceedings consistent with this opinion.[3]

---

[2] We conclude that the court did not abuse its discretion when it denied Akers's motion to reopen the suppression hearing. *See State v. Dolloff*, 2012 ME 130, ¶ 24, 58 A.3d 1032.

[3] Upon remand, the Superior Court may address the State's argument regarding inevitable discovery that was expressly not reached in its April 1, 2019, decision. Additionally, the court on remand may also consider whether Akers's spontaneous statements were sufficiently attenuated from the constitutional violations that we have noted herein as to render them admissible.

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Bruce Akers

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

York County Unified Criminal Docket docket number CR-2016-474
FOR CLERK REFERENCE ONLY