MAINE SUPREME JUDICIAL COURT                     Reporter of Decisions
Decision:    2024 ME 42
Docket:      Ken-23-43
Argued:      December 6, 2023
Decided:     May 23, 2024

Panel:       HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ, and HUMPHREY, A.R.J.[1]

STATE OF MAINE

v.

NICHOLAS P. LOVEJOY

LAWRENCE, J.

[¶1]  Nicholas P. Lovejoy appeals from a judgment of conviction of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2024), entered in the trial court (Kennebec County, *Stokes, J.*) on Lovejoy's conditional guilty plea.  He argues that the court erred when it denied his motion to suppress evidence that was obtained from an allegedly unlawful traffic stop and a subsequent search of his home without a warrant and without any applicable exception to the warrant requirement.  Further, Lovejoy contends that the court abused its discretion in considering his mental state and post-crime conduct in step two

---

[1]  Although Justice Jabar participated in the appeal, he retired before this opinion was certified.  Although not available at oral argument, Active Retired Justice Humphrey participated in the development of this opinion.  *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.").

of its sentencing analysis. We conclude that the court properly denied Lovejoy's motion to suppress because the traffic stop was supported by reasonable, articulable suspicion and because the warrantless search of his home was, considering the totality of the circumstances, a reasonable response to what law enforcement knew, and had an objectively reasonable basis to believe at the time, to be an exigent circumstance. We also conclude that the court did not abuse its discretion in sentencing Lovejoy. We therefore affirm.

## I. BACKGROUND

[¶2] We view "the evidence in the light most favorable to the court's order on the motion to suppress." *State v. Akers*, 2021 ME 43, ¶ 2, 259 A.3d 127. The following facts are supported by competent record evidence. *See id.*

[¶3] Lovejoy and the victim were long-term romantic partners and the parents of twin children. Lovejoy, the victim, and the children, who were eight years old at the time of the events in this case, lived together in an apartment in Waterville. On October 22, 2019, at around 6:45 p.m., a friend of the victim contacted the Waterville Police Department because she was concerned for the victim's well-being. The friend told the police that she had not heard from the victim all day, which was unusual, and that there was a history of domestic violence between Lovejoy and the victim. Officers were dispatched for a

welfare check and arrived at the family's home at 7:13 p.m. The dispatcher advised the officers that Lovejoy had a history of possessing firearms.

[¶4] The officers did not observe anyone at the home and were unable to contact Lovejoy, the victim, or the victim's friend, so they returned to the station. At around 8:00 p.m., two other friends of the victim went to the Waterville Police Department and expressed concern for the victim's safety. At 10:30 p.m., Officer Codey Fabian and Sergeant Jason Longley returned to the home and observed lights on inside the residence and the victim's car parked in the driveway.

[¶5] The officers knocked on the door. Lovejoy opened the door, and the officers stated their concern for the victim's safety. Lovejoy responded that the victim had left around 7:30 that morning to bring the children to the school bus stop, after which she came back to the residence, left to get coffee at the store, and after returning home with the coffee, then left the residence on foot at 9:00 a.m. Lovejoy stated that he did not know where she had gone and that she had not returned. The officers asked if they could enter the home, but Lovejoy declined because the children were asleep inside. The officers and Lovejoy talked for about forty-five minutes. At the end of the conversation, Lovejoy asked the officers whether he could leave the children asleep in the home while

he went to look for the victim. The officers told him that the children were not old enough to be left alone in the home.

[¶6]  After talking with Lovejoy, Sergeant Longley instructed Officer Fabian to remain and surveil Lovejoy's home. Officer Fabian parked his police cruiser on the street around the corner from the home at a location where he could see the side of the home and the victim's car parked in the driveway. Using a pair of binoculars, Officer Fabian watched Lovejoy through a window as he appeared to mop the floor of the kitchen. At 11:37 p.m., Officer Fabian observed Lovejoy exit the home and walk his dog around the property for twelve minutes.

[¶7]  At 12:30 a.m., Officer Fabian observed Lovejoy exit the home and get into the victim's car, pulling it out onto the street where the officer was parked. At 12:31 a.m., after noting that one of the two rear license plate lights was out on the victim's car, Officer Fabian stopped Lovejoy about ten to twenty yards from the home.

[¶8]  Other officers arrived, including Sergeant Longley. Officer Fabian spoke to Lovejoy at the driver's-side window. Sergeant Longley, who had walked around to the opposite side of the car, observed a shotgun, with a loaded magazine, sitting on the front passenger seat. Lovejoy admitted that the gun

was loaded and told the officers that he was on the way to the store and had the gun for self-defense. Lovejoy was arrested for having a loaded firearm in a motor vehicle (Class E), in violation of 12 M.R.S. § 11212-A(2) (2024), and for endangering the welfare of a child (Class D), in violation of 17-A M.R.S. § 554(1)(C) (2024). During the arrest, officers told Lovejoy that they would be entering his home to check on the safety of the children. The officers did not ask for consent to search the home, and Lovejoy did not give consent for a search.

[¶9] After taking nearly thirty minutes to organize and confer about what to do next, officers, including Officer Fabian and Sergeant Longley, used a spare key to open the front door of Lovejoy's home.[2] They entered the first floor of the residence and observed, inter alia, a piece of cardboard on the porch with stains that appeared to be blood, red or brown stains on the toe of a boot, red or brown stains on a roll of duct tape, a bottle of ammonia in the bathroom, and a mop in the kitchen sink. The officers also smelled an odor of cleaning solution and the floors appeared to have been recently mopped. The officers were on the first floor for about two minutes and did not locate the children.

---

[2] Lovejoy told Officer Fabian and Sergeant Longley the location of a spare key to the home prior to the officers' entry.

[¶10]  The officers attempted to go up the stairs but encountered an aggressive dog.  A sergeant of the Maine State Police arrived and suggested that the officers call out to the children; there was no response to those calls.  The dog was secured, and the officers located the children sleeping in their second-floor bedroom.  About thirty minutes elapsed between the officers' entry into the home and their discovery of the children.  During this period, the officers notified the Department of Health and Human Services of the situation.  The Department later took responsibility for the children.

[¶11]  Because Lovejoy's motion to suppress did not contest the legality of the officers' actions in the home after their entry, the evidence presented at the suppression hearing did not address the officers' subsequent activity in the home, including a further search that led to the discovery of the victim's body.[3]

[¶12]  On November 22, 2019, the State charged Lovejoy by indictment with one count of intentional or knowing murder, 17-A M.R.S. § 201(1)(A), in connection with the death of the victim alleged to have occurred on

---

[3]  Though details of the circumstances of the murder were not admitted in evidence at the suppression hearing, the court noted at sentencing that Lovejoy learned that the victim was having an affair; that their relationship had since been abusive and involved constant threats of injury or death, including with guns; that Lovejoy had sexually abused the victim; that Lovejoy shot the victim four times and then cleaned up the scene; that Lovejoy staged fake text and Facebook messages pretending that the victim was still alive; and that Lovejoy had attempted to hide the victim's body in the basement of the home.

October 22, 2019. On November 1, 2021, Lovejoy filed a motion to suppress (1) all observations and evidence resulting from the October 23, 2019, motor vehicle stop on the grounds that the stop was not supported by reasonable, articulable suspicion; (2) all observations, evidence, and "fruit of the poisonous tree" of the warrantless entry into and search of Lovejoy's home on October 23, 2019, on the grounds that the entry was unreasonable and not justified by an exception to the warrant requirement; and (3) statements Lovejoy made in custody at the Kennebec County Jail on the grounds that the statements were made involuntarily or in violation of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 467-79 (1966).

[¶13] The court held a hearing on the motion on January 21, 2022. Officer Fabian, Sergeant Longley, and Maine State Police Detective Joshua Birmingham testified. The court admitted in evidence video footage of the night's events from Lovejoy's personal surveillance cameras, the Maine Motor Vehicle Inspection Manual, and a diagram of Lovejoy's home. After the hearing, the parties submitted memoranda in support of their positions. On April 1, 2022, the court heard oral argument by the parties on the motion to suppress. In an order entered on April 7, 2022, the court granted the motion in part,

8

suppressing Lovejoy's statements but not suppressing any evidence gained as a result of the motor vehicle stop and the warrantless entry.

[¶14] The court held a Rule 11 hearing on May 4, 2022, at which Lovejoy entered a conditional plea of guilty to one count of murder. *See* M.R.U. Crim. P. 11. Following the hearing, the court sentenced Lovejoy to a term of forty-two years of incarceration and ordered him to pay $4,500 as restitution to the Victims' Compensation Program. Lovejoy timely appealed from the judgment of conviction. *See* 15 M.R.S. § 2115 (2024); M.R. App. P. 2B(b)(1). Lovejoy also filed an application for leave to appeal the sentence, which the Sentence Review Panel granted. *See* 15 M.R.S. § 2151 (2024); M.R. App. P. 20; *State v. Lovejoy*, No. SRP-23-44 (Me. Sen. Rev. Panel Apr. 19, 2023).

## II. DISCUSSION

### A. Traffic Stop

[¶15] Lovejoy argues that there was no reasonable, articulable suspicion, as required by the United States Constitution,[4] to support the traffic stop because (1) the vehicle had a functioning license plate light, which met the statutory requirement that the license plate be illuminated and legible from

---

[4] Lovejoy does not cite a specific constitutional provision supporting his argument, stating only that the traffic stop did not pass "constitutional scrutiny."

fifty feet away; and (2) Lovejoy was not endangering the welfare of his children when he was stopped close to his home. The State responds that (1) the inoperable plate light created reasonable, articulable suspicion that Lovejoy was committing a civil traffic infraction; and (2) leaving the home in a vehicle while his children were home sleeping, paired with the suspicious circumstances of the victim's disappearance, created reasonable, articulable suspicion that Lovejoy was endangering the welfare of the children.

[¶16] "We review a suppression court's findings of fact for clear error, and its legal conclusions de novo." *State v. Drewry*, 2008 ME 76, ¶ 19, 946 A.2d 981. Officers may conduct a traffic stop if they have reasonable, articulable suspicion that an individual has committed or intends to commit a crime or traffic violation. *See State v. Gulick*, 2000 ME 170, ¶ 13, 759 A.2d 1085; *State v. Richford*, 519 A.2d 193, 195 (Me. 1986). The standard of reasonable, articulable suspicion is low; it is considerably less than a preponderance standard and less than probable cause. *See State v. LaForge*, 2012 ME 65, ¶ 10, 43 A.3d 961. At the time of a stop, an officer must be able to articulate specific facts underlying his or her suspicion that a crime or traffic violation has occurred, that suspicion must be objectively reasonable considering the totality of the circumstances, and the officer must have "more than a bare speculation

or an unsubstantiated hunch." *Id.* ¶ 13; *State v. Bolduc*, 1998 ME 255, ¶ 6, 722 A.2d 44; *State v. Lear*, 1998 ME 273, ¶ 5, 722 A.2d 1266; *see also State v. Sasso*, 2016 ME 95, ¶ 2 & n.1, 143 A.3d 124 (finding that the officer had reasonable, articulable suspicion for a traffic stop because he observed that one of the defendant's brake lights appeared to be "stuck on").

[¶17]  In this case, prior to stopping Lovejoy while he drove the victim's car, Officer Fabian observed that one of the two lights intended to illuminate the car's rear license plate was out.  The court did not err in finding that it was objectively reasonable to believe that the inoperable light constituted a traffic violation.  *See* 29-A M.R.S. § 1909 (2018)[5] ("A vehicle must have a white light capable of illuminating the rear registration plate so that the characters on the plate are visible for a distance of at least 50 feet."); 29-A M.R.S. § 1768(5)(A) (2018) (stating that operating a vehicle not in compliance with the rules of the Chief of State Police outlined in the Maine Motor Vehicle Inspection Manual is a traffic infraction); Maine Motor Vehicle Inspection Manual, 16-222 C.M.R. ch. 1, § 170(9)(D)(9) (effective Aug. 29, 2013) ("Reject vehicle if the tail and rear plate lights do not operate properly in all switch positions.").  We need not go

---

[5]  Title 29-A M.R.S. § 1909 was recently amended, though the amendment is not relevant to this appeal.  *See* P.L. 2021, ch. 216, § 45 (effective Oct. 18, 2021).

further in our analysis because reasonable, articulable suspicion existed to justify the stop when the officer observed Lovejoy's inoperable license plate light. *State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984 ("In order to support a brief investigatory stop of a motor vehicle . . . a police officer must have an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." (footnote omitted)).

## B.    Warrantless Entry

[¶18]  Lovejoy also argues that the warrantless entry and search of his home violated the Fourth Amendment of the United States Constitution and therefore all evidence resulting from the entry and search should be suppressed.[6]  Lovejoy contends that there were no exigent circumstances, including circumstances that would fall under the emergency aid exception to the warrant requirement,[7] that would support the warrantless entry into his

---

[6] Though Lovejoy briefly references the relevant provision of the Maine Constitution, Me. Const. art. I, § 5, his arguments rely entirely on federal precedent.  Thus, we decline to analyze Lovejoy's claims under the Maine Constitution and instead analyze them under the United States Constitution. *See State v. Moore*, 2023 ME 18, ¶¶ 19-20, 290 A.3d 533 (declining to analyze Maine Constitutional claim where defendant failed to adequately raise the issue in the trial court or on appeal).

[7] Lovejoy asserts that the community caretaking exception, another widely recognized exigent circumstance that justifies an exception to the warrant requirement, does not extend to a search of a home. *See Caniglia v. Strom*, 593 U.S. 194, 197-99 (2021).  The State agrees.

12

home. Lovejoy argues that because the officers took no steps to determine whether the children were safe prior to entering Lovejoy's home, and because they had time to apply for and receive a warrant but did not do so, the warrantless entry was unreasonable.[8] The State responds that, although the officers did not attempt alternative modes of checking on the children's safety or attempt to obtain a warrant,[9] the entry was permissible pursuant to the emergency aid exception to the warrant requirement and was reasonable considering the totality of the circumstances.

[¶19] The Fourth Amendment of the United States Constitution protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Searches and seizures inside a home without a warrant are presumptively unreasonable." *French v. Merrill*, 15 F.4th 116, 133 (1st Cir. 2021) (quotation marks omitted). "But this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth

---

[8] Lovejoy also argues that because the officers did not subjectively believe that the children were in immediate danger, there was no exigency. This contention misstates the law. The emergency aid exception is analyzed from the perspective of an objective officer without considering the subjective intent of the officer at the time of the warrantless search or seizure. *See Michigan v. Fisher*, 558 U.S. 45, 47, 49 (2009).

[9] The State concedes that "it is also questionable whether officers could have obtained a warrant. Their search was not a search for evidence—it was a search for children."

Amendment is reasonableness."  *United States v. Bain*, 874 F.3d 1, 16 (1st Cir. 2017) (alterations and quotation marks omitted).

[¶20]  The primary exceptions to the warrant requirement for searches of homes include exigent circumstances, such as when entry into the home is necessary to administer emergency aid to an injured person or to prevent imminent injury.  *See id.* at 16-17; *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  The recognized exceptions to the warrant requirement for searches of homes are reflective of the Supreme Court's more general rule that "[w]hen a warrantless search or seizure is not per se unreasonable, the court may balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Bain*, 874 F.3d at 17 (quotation marks omitted).  We conclude that the officers' warrantless entry into Lovejoy's home was justified by the unique exigent circumstances presented at the time.

[¶21]  To justify a warrantless entry into a home under the emergency aid exception, there must be "an objectively reasonable basis for believing that there was such a compelling necessity for immediate action that the delay of obtaining a warrant could not be tolerated."  *Merrill*, 15 F.4th at 133 (quotation marks and alteration omitted); *c.f. Caniglia v. Strom*, 593 U.S. 194, 198-199

14

(holding that the community caretaking exception to the warrant requirement does not extend to the home, though exigent circumstances may still justify a warrantless search of the home). "The emergency aid exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Akers,* 2021 ME 43, ¶ 36, 259 A.3d 127 (alteration and quotation marks omitted). Therefore, to determine whether officers had an objectively reasonable basis for believing there was a need to enter a home without a warrant, "we look to the facts known to the officers at the time they made the decision to enter." *United States v. Maxwell*, 89 F.4th 671, 676 (8th Cir. 2023); *see, e.g., United States v. Giambro*, No. 2:22-cr-00044-GZS, 2023 WL 3123001 at *4 (D. Me. Apr. 27, 2023) (holding that warrantless entry of home was justified by emergency aid exception because defendant had told his son that defendant's wife had died in their home while the son was away on vacation but was evasive as to how; defendant would not tell the son where the body was; defendant had been brought to hospital by the son because he was confused; and officers, without getting a response, knocked on the door of the home, walked around the home looking for tracks in the snow, attempted to

look in the windows of the house and the garage, loudly banged on the door, yelled, "Sheriff's office," and instructed anyone inside to answer); *State v. Pine,* 219 N.E.3d 423, 434-37 (Ohio Ct. App. 2023) (holding that warrantless entry of the area under a trailer home was justified by emergency aid exception where officers responded to a call about domestic violence, the victim told a responding officer that defendant grabbed a firearm and loaded it after grabbing her by the throat, the defendant was seen crawling under the trailer with a firearm, the defendant crawled out from under the trailer and was placed under arrest but did not possess the firearm, more than ten adults and one child were aware that defendant had brought a firearm under the trailer, the trailer was close to the road and did not have a fence, and a neighbor volunteered to go under the trailer and retrieve the firearm).

[¶22]  Risk to an unattended young child is a factor that may be considered when determining whether an exigency requiring emergency aid exists.  *See, e.g., United States v. Bradley*, 321 F.3d 1212, 1214-15 (9th Cir. 2003); *State v. Peterson*, 543 S.E.2d 692, 696 (Ga. 2001).  An intensive, fact-based analysis is necessary, with consideration of, inter alia, the child's age, the circumstances of the child's caregivers, whether there are signs of distress from the child, and whether law enforcement attempted to confirm the child's safety

and were unable to do so prior to entering the home. *See, e.g., United States. v. Gillespie*, 332 F.Supp.2d 923, 927-28 (W.D. Va. 2004); *Bradley*, 321 F.3d at 1214-15 (9th Cir. 2003). The Supreme Court of Nebraska determined that officers were justified in entering a home without a warrant when they could reasonably conclude that two four-year-old children and a two-week-old infant were unaccounted for and had not had adult supervision for several hours, they were unable to verify the safety of the children with three different family members, the defendant had lied about the children's location, and prior police reports alleged that the children had suffered physical abuse by the defendant. *State v. Plant*, 461 N.W.2d 253 at 262-63 (Neb. 1990). Similarly, the Ninth Circuit determined it was permissible for officers to enter a home without a warrant to provide emergency aid where they had just arrested a child's mother on drug charges, the officers could not locate the child in either the child's home or a neighbor's home, the child was nine years old and may have been in the home alone, and the officers did not know if the home was safe. *See Bradley*, 321 F.3d at 1214-15; *see also Maxwell*, 89 F.4th at 676-77 (holding that warrantless entry was justified by need to provide emergency aid because officers reasonably believed that an infant and a toddler either were alone in a house with unaccounted-for, unsecured firearms that were evidence from an

armed robbery or were with a person who had recently threatened people with a firearm during an armed robbery); *Caniglia*, 593 U.S. at 204-08 (Kavanaugh, J., concurring) (noting that cases involving unattended young children inside a home may justify a constitutional warrantless entry under the exigent circumstances doctrine); *United States v. Sanders*, 4 F.4th 672, 677-78 (8th Cir. 2021) (holding that warrantless entry was justified by need to provide emergency aid because officers responded to a 9-1-1 call alleging a domestic disturbance, witnessed a child motioning in an upstairs window, observed the victim's injuries when she came outside the home, and heard a child crying inside the house); *Giambro*, 2023 WL 3123001, at *4; *Pine*, 219 N.E.3d at 436-37.

[¶23] The following facts support our conclusion that, at the time of the entry into Lovejoy's home, there was an objectively reasonable basis for believing that the officers needed to provide emergency aid:

- Three friends of the victim had contacted the police to voice concern for her safety and wellbeing because they had not heard from her all day, which was unusual;

- At 10:30 p.m., Lovejoy had given police an implausible explanation of the children's mother's absence—that she had left on foot in the morning, more than twelve hours earlier, and that she had neither returned nor been in contact;

- There was a history of domestic violence between Lovejoy and the victim;

- Lovejoy had a history of possessing firearms;

- Lovejoy had left the home in the victim's vehicle, late at night, while the children were sleeping, and told officers he was on the way to the store;

- At the time of the traffic stop, Lovejoy had a loaded shotgun in the vehicle, which he said he needed for self-defense;

- There were two eight-year-old children asleep inside the home;

- Lovejoy was under arrest and it was unclear whether and when he could meet bail conditions and be released; and

- With Lovejoy unavailable, there were no adults in the home.

After the officers entered Lovejoy's home, they conducted a brief search of the first floor of the home but were unable to locate the children. Once it was safe for them to do so, the officers proceeded upstairs and confirmed the safety of the children. We conclude that, considering the totality of the circumstances, the officers were justified in entering Lovejoy's home without a warrant.

## C.    Sentencing

[¶24] Lastly, Lovejoy contends that the court erred in considering, in the second step of the sentencing analysis, his mental state at the time of the offense and his "post-murder conduct," arguing that these factors are properly considered *only* at the first step. Lovejoy argues that the court's analysis was prejudicial because consideration of these factors at step two reduced the

impact of mitigating factors also considered in step two. The State responds that the sentencing court has broad discretion in its examination of sentencing factors and that the court did not abuse its discretion in sentencing.

[¶25] In a sentencing for murder, a court must follow a two-step process codified at 17-A M.R.S. § 1602(1)-(2) (2024). The statute provides:

> **A.** First, the court shall determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the individual.
>
> **B.** Second, the court shall determine the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case. Relevant sentencing factors include, but are not limited to, the character of the individual, the individual's criminal history, the effect of the offense on the victim and the protection of the public interest.

The purpose of the first step of the analysis is to place the crime "at a point on the continuum for the type of criminal conduct involved." *State v. Bentley*, 2021 ME 39, ¶ 15, 254 A.3d 1171 (quotation marks omitted). The second step of the analysis "encourage[s] individualization of each sentence based on circumstances specific to the case and the defendant." *Id.* ¶¶ 11, 16. We afford the sentencing court "significant leeway in what factors it may consider and the weight any given factor is due when determining a sentence." *Id.* ¶ 11. Sentencing courts may "refer to the same facts in the various steps of the

sentencing analysis *so long as the court is weighing different considerations at each step*." *State v. Gray*, 2006 ME 29, ¶ 13, 893 A.2d 611 (emphasis added and quotation marks omitted).

[¶26] Lovejoy does not challenge the basic sentence set by the court in the first step of the analysis; he challenges the court's analysis in the second step supporting the maximum sentence of forty-two years. "We review the trial court's application of aggravating and mitigating factors in determining the maximum sentence for abuse of discretion." *State v. Gaston*, 2021 ME 25, ¶ 36, 250 A.3d 137 (quotation marks omitted).

[¶27] Contrary to Lovejoy's contention, the court did not "double-count" the consideration of Lovejoy's mental state at the time of the offense and his post-murder conduct. In step one, the court discussed Lovejoy's mental state and post-murder conduct to determine whether the murder was premeditated. *See State v. De St. Croix,* 2020 ME 142, ¶¶ 8-12, 243 A.3d 880. In step two, the court considered Lovejoy's traumatic brain injury in the context of his mental state and post-murder conduct to determine the extent of the injury's impact on his cognitive abilities at time of the crime. The court stated:

> But what it does suggest to me is his ability to realize what he had to do now was to conceal the crime by cleaning it up, by moving her body, by concocting a story about [how] she walked off, haven't seen her since, let me go out and look for her, all that stuff is

> complete hogwash, and he knew it. So as much as I think the [traumatic brain injury] . . . is a legitimate mitigating circumstance . . . it is really offset by his cognitive ability to take steps to conceal what he had done . . . .

The court, as our case law permits it to do, analyzed the same facts for different purposes: in the first step to determine if there was premeditation and in the second step to determine the extent to which Lovejoy's traumatic brain injury was a mitigating circumstance. *See Gray,* 2006 ME 29, ¶ 16, 893 A.2d 611 ("The court responded to [the defendant's] argument that his brain injury should be considered as a mitigating factor by pointing to several of his deliberate acts during the commission of the offenses. The recitation of the facts of the offenses in more than one step of the sentencing analysis is not an abuse of discretion when it is done for a different purpose."). We discern no abuse of discretion and thus affirm the sentence.

The entry is:

Judgment and sentence affirmed.

Scott F. Hess, Esq. (orally), The Law Office of Scott F. Hess, LLC, Augusta, for appellant Nicholas P. Lovejoy

Aaron M. Frey, Attorney General, and Katie Sibley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2019-2350
FOR CLERK REFERENCE ONLY