**STATE of Maine**

**v.**

**Augustus F. HEALD, Jr.**

**STATE of Maine**

**v.**

**Robert H. MOTTRAM.**

Supreme Judicial Court of Maine.

Jan. 19, 1973.

John L. Easton, Jr., Co. Atty., Dover-Foxcroft, for plaintiff.

Jules L. Mogul, Bangor, for defendant Heald.

Bartolo M. Siciliano, Dexter, for defendant Mottram.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEBBER, Justice.

In each of these two cases the defendants are charged by identical indictments with breaking, entering and larceny from a store in Dover-Foxcroft. In each case a motion was filed to suppress certain evidence found in an automobile owned and driven by Mottram and occupied at the time of apprehension by both defendants. Additionally a motion to dismiss the indictments was filed by defendant Mottram and joined by defendant Heald at the time of hearing, grounded upon the presumed use before the grand jury of evidence subject to suppression. After hearing, the Justice below granted the motions to suppress and denied the motion to dismiss the indictments. By order of the Superior Court both rulings have been reported for our review.

The Justice below made detailed findings of fact with respect to the arrest of the defendants and the initial search as a part of his "Order" on the motion to suppress as follows:

"Between 1:45 and 2:00 A.M. on February 16, 1970, Eugene F. Mountain, Jr. arrived at his store on West Main Street in Dover-Foxcroft to plow snow and discovered that his store had been broken into and the contents of a safe and some merchandise stolen. Sheriff Frank Murch was called to the scene and he in turn called Deputy Sheriff Paul Ruksznis and Officer William Fair of the Dover-Foxcroft Police Department. After looking around the store, Sheriff Murch and Deputy Ruksznis followed two sets of boot tracks on foot through the snow to a lumberyard where it appeared from the tracks that the persons had entered a parked vehicle and driven away. A new snowfall of several inches had ended in the Dover area prior to midnight on the 15th. The two officers followed the vehicle tracks about one block to the intersection of Forest and Park Streets where they were met by Officer Fair in his police car. They had noted that the vehicle tracks were smooth in the center but had ridges on the sides of the tread-mark. Officer Fair had been cruising the streets on the north-west side of the town and he had just found on Park Street near Forest Street a checkbook bearing the name of Eugene Mountain. Deputy Ruksznis and Officer Fair continued about three miles out of town on Park Street, Dawes Road and Anderson Road, which leads into Wharf Road in the town of Guilford. Some of these roads had been plowed more recently than others, with the Guilford end being most recently plowed. These two officers came upon a tan colored 1964 Chevrolet 'Corvair' automobile (Maine registration #428–542) stopped at the side of the road headed toward Guilford. As soon as they saw it, the car's lights came on and it started up. By radio, the officers learned the car was registered to a Robert Mottram of Bath which meant nothing to them except that he was not a native of the area. About one-quarter to one-half mile into Guilford the officers put on the blue light and stopped the car.

Officer Fair approached the driver's side with drawn gun, while Deputy Ruksznis approached and arrested defendant Heald, who was getting out of the passenger side, for 'breaking and entering.' Officer Fair ordered defendant Mottram, who was the driver as well as the owner of the car, to get out of the car and Officer Fair arrested him. Deputy Ruksznis took a revolver from Heald's jacket pocket and had him move behind the car. Both defendants were personally searched, and under control of the officers.

Deputy Ruksznis went to the driver's side of the car and removed another revolver from the front seat. He also ob-

served tools on the floor on the passenger side. He called Sheriff Murch by radio for assistance and then he opened the locked trunk at the front of the 'Corvair', searched the trunk, and then he searched the glove compartment. Deputy Ruksznis testified he was searching for weapons and that he removed nothing from the car other than the revolver. Both defendants were taken to the County Jail." [1]

The State subsequently filed a request for additional findings of fact. The Court dismissed the request "for the reason that to the extent the requests are *inconsistent with the Court's previous findings* they must be denied and to the extent the requests are not covered by the Court's previous findings the parties *must be left to the record.*" (Emphasis ours) We construe this order as not intended to preclude the reviewing Court from noting such additional facts, deemed material on the issue of probable cause, as are supported by undisputed evidence and not inconsistent with the express factual findings of the Justice below. In so saying we are mindful that there was no blanket rejection of the veracity and credibility of the testifying officers since the facts expressly found below rested entirely upon the testimony of these officers. The testimony of the State's witnesses was rejected by the Justice below only as to certain matters carefully and precisely defined by his findings of fact. Accordingly, in our initial review of the facts we will advert only to facts found and facts omitted from the findings not inconsistent with the findings made, but which we deem significant and clearly proven on the record.

At the outset it may be noted that tracks in new snow furnish a prime example of trustworthy circumstantial evidence and one which with great frequency has been used by trial courts in explanatory instructions to juries. When, as in this case, there has been a recent fall of snow, the presence or absence of fallen or drifted snow in the tracks is revealing as

to approximately when the tracks were made. Tracks often speak louder than words as to the direction taken by and the activities of those who made them. In the instant case the activities of the two persons who broke and entered the store of Eugene F. Mountain, Jr. some time before 1:45 A.M. on February 16, 1970 were clearly revealed in the snow.

By back-tracking from the store and observing the size and condition of the tracks it was possible for the investigating officers to determine that at some time in the evening two men had approached the Mountain store on foot by a circuitous route, crossing West Main Street at a point some distance from the store and proceeding along the bank of the Piscataquis River to a wooded area near the river and in the rear of the store; and that they had spent some time in the woods in a well tramped area and had finally approached the rear entrance of the store. There was physical evidence that they forced the door and gained entrance, broke into the safe and removed virtually its entire contents as well as numerous other items on the premises. Following the tracks leading from the store, the officers noted that some items taken from the store had been abandoned both in back of the store and further along the line of these tracks; that, leaving the store, the two men had proceeded across West Main Street, across an intervening area to Dwelley Avenue, a street running parallel to West Main Street, and thence across Dwelley Avenue and into what is referred to by the witnesses as a sawmill yard. There the foot tracks ended and it was apparent that at this point the two persons had entered a motor vehicle equipped with tires smooth on the inside but having some remaining tread on the outside edges. Two officers, proceeding on foot and equipped with an electric lantern, followed these tire tracks out of the sawmill yard and thence in a northerly direction along Forest Street to its intersection with Park Street. There they encountered Officer Fair, a

[1]. We defer consideration of other findings more closely related to a subsequent search of the vehicle under warrant.

Dover-Foxcroft police officer, who had parked his police cruiser near the intersection. Fair had at the request of the Sheriff just completed a surveillance of streets of the town in the course of which he observed no moving vehicle. While Officer Fair was waiting in his parked car for the arrival of the officers who were moving toward him on Forest Street, he observed and retrieved a checkbook lying on the snow in the intersection area. From its contents this checkbook was identifiable as the property of Mr. Mountain. While the officers were assembled at the intersection, the motor of an automobile was started in the yard of a residence on Hancock Street and the car was then driven back toward the village. The owner of this vehicle was known to Officer Fair. No other vehicle was observed in motion by the officers during their investigation until they encountered the Mottram car. Deputy Sheriff Ruksznis and Officer Fair then undertook to follow the tracks of the vehicle which had been parked in the sawmill yard. They proceeded in a westerly direction on Park Street, turned right at its intersection with Dawes Road and turned left at the intersection of Dawes Road and Anderson Road. After proceeding about a mile they stopped and picked up at the side of the road a paper bag lying on top of the fresh snow and containing small electrical parts. After proceeding some three or four miles they came upon an automobile stopped in the *middle* [2] of the highway with its lights out. As the officer's car approached the rear of the stopped vehicle, its lights were turned on and it proceeded forward for some distance until the blue dome light of the police car was turned on, whereupon the automobile was stopped by the driver, Mottram. The arrest of the two defendants followed immediately.

The standards to be applied in a determination of probable cause were clearly defined in Brinegar v. United States (1949)

338 U.S. 160, 174, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 and have been adhered to in subsequent cases. The Court said in part:

"Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.

However, if those standards were to be made applicable in determining probable cause for an arrest or for search and seizure, more especially in cases such as this involving moving vehicles used in the commission of crime, few indeed would be the situations in which an officer, charged with protecting the public interest by enforcing the law, could take effective action toward that end. Those standards have seldom been so applied.

In dealing with probable cause, however, as the very name implied, *we deal with probabilities.* These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

*       *       *       *       *       *

These long prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less

---

2. The Justice below found that this vehicle was stopped at the *side* of the road. This was no doubt inadvertent error since the *only* evidence was that the car was in the *middle* of the road. In this respect the testimony of

the officers was confirmed by defendant Mottram who asserted that he fell asleep with his car parked in the *middle* of the road with its lights off.

ambiguous, *room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement.* To allow less would be to leave law-abiding citizens at the mercy of the officer's whim or caprice." (Emphasis ours)

■ Applying this standard to the facts of this case, we conclude that these officers had probable cause to believe that the occupants of the car they had overtaken had burglarized the store earlier that night. Some of the factors present here were deemed significant in United States v. Troutman (1972) 10 Cir., 458 F.2d 217, 220. Therein it was "noted that Highway 160 was not comparable to the New Jersey turnpike with its constant flow of traffic and that travel in that sparsely populated area of Kansas at three o'clock in the morning was not the usual." The Court also stated, "The fact that no vehicle other than the one here in question was seen by either (of the arresting officers) till after the arrest is deemed to be significant." Here the burglary occurred in a small Maine town in the most sparsely settled county in the State. Apprehension occurred in a rural area in the small hours of the morning. Except for the identified vehicle seen on Hancock Street, no officer had encountered a moving vehicle either in the environs of Dover-Foxcroft or on the pursuit route. As the officers stood at the intersection of Park and Forest Streets examining the tire tracks in the snow they had the additional evidence that the get-away car had passed through the intersection furnished by the finding of Mountain's checkbook. When a mile further on they found the bag containing electrical parts, they could rationally infer that it also came from Mountain's store, that it had been thrown from a car and that they were on the right track.

When thereafter they came upon the car, it was stopped in the middle of the road with the lights off. That this highly unusual and suspicious circumstance was not attributable to the car's being disabled and inoperable was immediately evidenced by the fact that the car's lights were turned on and the vehicle moved ahead without difficulty. On these facts alone the officers had probable cause to believe that they had finally caught up with the thieves who had burglarized the Mountain store. Although the possibility of mistake existed, as it invariably does in a probable cause situation, they would have been remiss in their duty if they had not arrested the defendants promptly.

We turn now to the considerations which prompted the Justice below to find no probable cause to arrest under these circumstances. With commendable candor and with the avowed intention of aiding appellate review, he has set forth in detail the precise factors which motivated decision. The findings state in part:

"The most important single issue before this Court is whether Deputy Ruksznis and Officer Fair had probable cause to believe these defendants had committed the break at Mountain's Store *at the time of their arrest.* The issue depends entirely upon whether or not these two officers followed a single, continuous set of tire tracks from the lumberyard to the point of arrest. There is no doubt that the arrest preceded any talk with, or observation of the defendants or the interior of their car. No evidence then known to these officers would have singled out this particular car as containing the guilty pair unless it be the allegedly *sole and continuous pair of tracks* on the road.

\* \* \* \* \* \*

The Court is not persuaded that the State has sustained its burden. It is difficult, if not impossible, to set forth all of the factors affecting the credibility of important parts of the testimony. Some of the circumstances of this case are in-

dicative of a willingness on the part of persons in authority to adjust the record to support their actions. In addition to the irregularities already noted, the evidence disclosed that the record of arrest of these defendants at the County Jail had been altered by someone to eliminate the name of Fair as the arresting officer. Officer Fair's testimony was contradictory to that of Deputy Ruksznis on the question of arrest, and patently less believable. Deputy Ruksznis, upon cross-examination, first said that *he believed* that he had compared the tires before getting out of the police car. He was not sure that he had ever looked closely at the tires. Then he was unsure when he had looked at the tires. Then, after one very long pause, he was certain he had stooped over to examine the tires. Officer Fair suggested on cross-examination that they had examined the rear tires of defendants' car as they followed it. It would be impossible to observe the tread of a tire while in motion, and it would be unnecessary if they had in fact followed a continuous pair of tracks.

The witnesses were insistent upon the fact that there were no other vehicle tracks on the road. This testimony was reiterated at times when not even appropriate to the question being answered. In fact, the witnesses were so adamant on this issue that they were left on cross-examination with the assertion that the pair of tracks turned corners without revealing any sign of the front wheel tracks; a patent impossibility in view of the nature of the vehicle.

Perhaps the most revealing testimony came from Officer Fair as he was narrating the events just prior to the arrest. They had received Mottram's name by radio and he volunteered the information that the name meant nothing to either officer. Then he said that in view of what had taken place they had decided they had better stop them; a gross understatement if they had in fact been following a continuous pair of tracks. These officers would have *known* they had the guilty party and would have radioed for help *immediately* rather than merely checking a registration number."

Although we are critical as was the Justice below of efforts of prosecuting officials to amend official records after the fact in order to "support their actions," and although we can agree that the overstatement of a factual position by a witness tends to impair his credibility, we are not satisfied that these factors as applied to the facts of this case operate to produce or justify the suppression of the evidence of criminal activity. It is apparent that the Justice below attached overriding importance to the presence of only one set of tire tracks on the route taken by the Mottram car that night, and to the ability of the pursuing officers to observe and follow those tracks *continuously* from the sawmill yard to the point of apprehension. Such a proof requirement would in our view impose a standard for probable cause far more rigid and inflexible than that defined by *Brinegar*. Even if there had been other equally fresh tire tracks in the road that night and even if there had been areas along the route where the officers were unable with any degree of certainty to discern and identify the smooth tread tracks they were looking for, we would nevertheless view *the other undisputed facts* as constituting ample proof of probable cause to make an arrest and search the vehicle for instruments of the crime, contraband and evidence of criminal conduct.[3]

---

3. Moreover, we do not read the testimony of Deputy Ruksznis as stubbornly denying the possibility that the Mottram vehicle when making turns at intersections may have left separate tracks imprinted by the front tires and the rear tires. The witness, having several times stated that the tire tracks of *but one vehicle* appeared in the snow, gave the following testimony on cross-examination:

"Q. By the way, what about the front tires on this vehicle, what sort of mark did they have?

With probable cause to arrest the defendants, the officers had the right to make a search incidental thereto for weapons and for evidence or contraband which might readily be concealed or destroyed. Chimel v. California (1969) 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The initial pat-down of defendant Heald yielded a revolver and the officers were then alerted to the fact that they were dealing with dangerously armed persons. Defendant Mottram was then standing at the side of his car but not secured by handcuffs as the only available handcuffs had been used to secure defendant Heald, the bigger man of the two. It was therefore by no means unreasonable to look inside the vehicle where a second revolver was partially revealed lying on the seat. There was then also exposed in plain view on the floor of the car tools adaptable for burglary. Although the strictures of *Chimel* would doubtless not permit a search of the trunk as incidental to the arrest, the officers then had more than enough evidence to provide probable cause to make a complete search of the vehicle. Such a search did not become invalid merely because the officers erroneously believed they only had a right to search for weapons. As was said in Chambers v. Maroney (1970) 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. *Given probable cause to search*, either course is reasonable under the Fourth Amendment." (Emphasis supplied)

The mobility of the automobile, the time and place of apprehension, the possibility of rendezvous with confederates—all were factors of the type recognized in Coolidge v. New Hampshire (1971) 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 as presenting the requisite exigent circumstances to make reasonable and therefore lawful an immediate probable cause search at the scene.

Such was the conclusion reached in United States v. Troutman, supra, in a rather

A. I didn't check those.

Q. Did you observe or do you know from the lumber yard as you proceeded from the lumber yard to the point where the vehicle was stopped any separation of tire tracks indicating a turn or a bend in any tracks of the line of travel of these tire tracks?

A. I don't understand your question.

Q. Let me withdraw that. Did you observe at any time from the time you left this lumber yard to the point you stopped the vehicle any markings different from the set of tire tracks or wheel marks you have described so far?

A. Not to my knowledge.

Q. Did you follow the tire tracks around corners?

A. Excuse me. I didn't hear you.

Q. Did you follow the tire tracks around corners of any street intersection?

A. When?

Q. Either way, walking or riding?

A. Yes, I did.

Q. And at any of those turns did you observe any tire marks or wheel marks in addition to the two tire marks you have described?

A. *Not that I noted.*" (Emphasis ours)

We find it difficult to understand why these somewhat equivocal answers should be deemed to be completely inconsistent with the testimonial assertion that the tracks of only one vehicle were observed. As the question was framed it is not entirely clear whether the witness was responding in terms of tracks *made by another vehicle* or alternatively was attempting to indicate that if the Mottram vehicle left separate front wheel tracks he failed to observe them. It is important to take into account the fact that the insistence of the witnesses that the tracks of only one vehicle were present is supported by persuasive circumstantial evidence. By *some means* these officers were able to take the precise course which Mottram admits he took from Park Street to the point of apprehension. With unerring accuracy and without any apparent necessity to pause and investigate, the officers pursued the right course through a number of intersections, proceeding straight through or turning right or left as circumstances required until they overtook defendant's automobile. This accomplishment in and of itself strongly suggests that the officers were indeed aided by the presence of the tire tracks left by the Mottram car. In any event, however, in our view and for the reasons stated in the text of the opinion decision as to probable cause does not rest on our interpretation of the testimony bearing on a "sole and continuous line of tire tracks" leading to the Mottram car.

similar factual situation, wherein the Court stated:

"And the facts and circumstances which rendered the arrest a lawful one, when coupled with the discovery of the burglary tools thrown from the car by one of its occupants, constituted probable cause for the thorough search of the automobile then made by the authorities on the open highway at four o'clock in the morning."

■■ The Justice below understandably expressed doubts as to the quantum of proof required whenever the court is required to determine the validity of a search and seizure. We have not heretofore had occasion to meet this issue squarely and therefore take this opportunity to do so. In such cases the conflict relates to the ultimate result, whether certain evidence in the possession of the State may or may not be introduced in the course of the trial. The defendant may proceed in one of two ways. He may object to the introduction of the evidence when it is offered and seek a determination by the trial court in the absence of the jury—or he may before trial move to suppress the evidence before it is offered. Viewed in that light the motion to suppress is in effect an anticipatory objection and may be so treated for burden of proof purposes. Indeed, the State may immediately lay the whole matter to rest by withdrawing the evidence from the case and assuring the trial court that it will not be offered. If, however, the State intends to use the evidence, it is both reasonable and fair to impose upon the State the burden of justifying that use. Confusion arises, perhaps, because a careful distinction must be made as between the ultimate conclusion, probable cause, and the underlying facts which must be proven before that conclusion can be reached. Probable cause rests on probabilities and is objective in nature. It is not whether particular officers thought or believed they had cause to arrest or search. It is rather whether on the basis of facts known or reasonably believed by him, an ordinarily prudent and cautious officer would have probable cause

to arrest or search. Burden of proof relates to credibility of witnesses and weight of evidence and has particular application here to the proof of facts which mark the path to or away from the ultimate finding of probable cause. Drawing examples from the instant case, was it proved by whatever quantum of proof is requisite that snow fell on the evening in question, that there was a break in at the Mountain store, that certain tracks in the snow were discernible, and in fact seen, of such a nature and in such locations as to permit certain inferences which police might rationally draw therefrom, that no other vehicles were moving in the area, that certain stolen items were found in various locations, that the police car took the same route out of Dover-Foxcroft as had the Mottram vehicle, that the Mottram car was parked in the middle of the highway with its lights off but was not disabled or inoperable, that its apprehension occurred late at night in a remote area, that the defendants were armed and that there were tools in plain view in the defendants' car? When the facts adequately proven produce the conclusion that there was probable cause, and when required, exigent circumstances, it matters not that certain other additional but unnecessary underlying facts are not deemed by the factfinder to have been proven. At that point the case has already been made.

By what quantum of proof, then, must these underlying facts be shown? In our very recent opinion in State of Maine v. David Collins (Opinion December 8, 1972) 297 A.2d 620, we attacked this identical problem with respect to proof of underlying facts necessary to support the conclusion that a written confession was voluntarily made. Recognizing that in its most recent expression in Lego v. Twomey (1972) 404 U.S. 477, 92 S.Ct. 619, 30 L. Ed.2d 618, the Supreme Court of the United States imposed as a minimum standard the "preponderance of the evidence" test, leaving the States free "pursuant to their own law," however, to impose a more rigid standard, we concluded on balance that in this jurisdiction we should require proof of

facts supporting a conclusion of voluntariness beyond a reasonable doubt. In reaching this conclusion we attached great importance to the fact that the rule of exclusion of involuntary confessions is in effect provided by the Fifth Amendment itself.[4] In *Collins* we said, "The constitutional privilege against self-incrimination, as a limitation upon government, *provides its own inherent evidentiary exclusionary doctrine* predicated upon 'voluntariness.'" (Emphasis supplied) It is important to note also that the *Collins* statement has equal application to Article I, Section 6 of the Maine Constitution.[5] Indeed, it was the "high priority" which the "exclusionary doctrine" gives to the right guaranteed by the Fifth Amendment to the United States Constitution and by Article I, Section 6 of the Maine Constitution which prompted us to impose upon the State a burden more rigorous even than that imposed by the Supreme Court.

█ It does not follow, however, that an equally heavy burden must or should be imposed upon the State in search and seizure cases. Neither the Fourth Amendment to the United States Constitution nor Article I, Section 5 of the Maine Constitution (offering equivalent protection of the right of privacy)[6] contains its own "evidentiary exclusionary doctrine." The rule of exclusion is judicially created. Indeed, no such doctrine existed as applicable to the several states until 1961 when the Supreme Court decided Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. *Mapp's* purpose was to deter police action which violated Fourth Amendment rights and to compel consistency as between State and Federal procedures. We are not persuaded that implementation of the exclusionary rule set forth in *Mapp* requires that

we impose upon the State any more rigorous burden than was imposed by the Supreme Court in Lego v. Twomey. We therefore hold that the State must prove by the fair preponderance of the evidence the underlying facts supporting the ultimate conclusion that there was probable cause to arrest or conduct a warrantless search.

In this case that standard of proof was fully met. Our analysis of the facts proven, as heretofore fully set forth, satisfies us that the ultimate conclusion that there was probable cause to arrest and to search and seize on the spot in this case was compelled. To equate probable cause with virtually absolute certainty of guilt is error and the public interest in the successful prosecution of criminal conduct requires that the State not be deprived of the use of evidence lawfully obtained.

After the arrest had been made and the search completed, the Sheriff and another officer arrived in response to a radio call for assistance. Apparently it was then decided not to seize the items revealed by the search (other than the weapons) but to impound the car and seek a warrant. On the following day a search warrant was obtained, the car was again searched and the items found in the car seized. Among these items were property stolen from the Mountain store and the tools which had been observed on the floor of the automobile. The Justice below was satisfied as are we that the affidavit filed in support of the search warrant furnished a proper basis for a finding of probable cause by the magistrate. The Justice below gave as his only reason for suppressing the evidence obtained pursuant to the warrant the fact that significant portions of the information contained in the affidavit stemmed from what he deemed to be an

4. The Fifth Amendment expressly provides, "No person * * * shall be compelled in any criminal case to be a witness against himself."

5. Article I, Section 6 of the Maine Constitution provides in pertinent part, "In all criminal prosecutions, the accused * * * shall not be compelled to furnish or give evidence against himself."

6. Article I, Section 5 of the Maine Constitution was never understood as carrying an implicit evidentiary exclusionary requirement. State v. Burroughs (1881), 72 Me. 479, 481; See Papolas v. State (1967—Me.), 235 A.2d 533, 534.

**830**

unlawful arrest and an unlawful search incidental thereto. In the light of our holding that there was probable cause to make an arrest and additionally probable cause and exigent circumstances justifying an immediate search, this reason for suppression of evidence obtained under proper warrant disappears.

For the reasons stated we are compelled to hold that the order of suppression was "clearly erroneous" and must be reversed. The appeal by the defendants from the refusal below to dismiss the indictments having been grounded solely on the claim of grand jury use of tainted evidence, the decision with respect to the suppression of evidence in effect controls the determination of this issue as well. Since a premature public release of this opinion might impede the trial process when these cases are subsequently tried on the merits, this opinion must be impounded.

The entry will be

Appeal by the State in each case sustained. Motions to suppress denied. Appeals by the defendants denied. Cases remanded to the Superior Court for further proceedings not inconsistent with this opinion.

All Justices concurring.