MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:      2022 ME 41
Docket:        Oxf-21-302
Argued:        May 11, 2022
Decided:       July 5, 2022

Panel:         STANFILL, C.J., and MEAD, JABAR, CONNORS, and LAWRENCE, JJ.*

## STATE OF MAINE

v.

## RONDON ATHAYDE

CONNORS, J.

[¶1]  Rondon Athayde appeals from a judgment of conviction of murder, 17-A M.R.S. § 201(1)(A), (B) (2018),[1] entered by the trial court (Oxford County, *Stokes, J.*) after a jury trial, and from his sentence of fifty years in prison.  He argues that (A) the court erred in denying his motion to suppress upon concluding that his statements to law enforcement while walking them through his home were voluntary, (B) the court erred in denying Athayde's motion for

---

*  Although Justice Humphrey participated in the appeal, he retired before this opinion was certified.

[1]  Because of statutory amendments enacted since the relevant time, *see, e.g.*, P.L. 2019, ch. 462, § 3 (effective Sept. 19, 2019) (codified at 17-A M.R.S. § 201(4) (2022)); P.L. 2019, ch. 113, §§ A-1, A-2 (effective Sept. 19, 2019) (repealing and replacing sentencing statutes), in this opinion we cite the substantive statutes, including the statutes governing the imposition of the sentence, that were in effect at the time of the victim's death, which occurred in December 2018. *See State v. Hardy*, 489 A.2d 508, 512 (Me. 1985) (holding that "the wrongdoer must be punished pursuant to the law in effect at the time of the offense").

2

judgment of acquittal because a jury could not rationally find that his conduct was sufficient to cause the victim's death, (C) the court committed obvious error by failing to instruct the jury on concurrent causation, and (D) the court misapplied legal principles or abused its sentencing power in considering a history of domestic violence between Athayde and the victim in determining his basic sentence. We affirm the judgment of conviction and the sentence.

## I. BACKGROUND

[¶2] Viewing the evidence admitted at trial in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt. *See State v. Dorweiler*, 2016 ME 73, ¶ 6, 143 A.3d 114.

[¶3] On the night of December 12, 2018, and in the early morning hours of December 13, 2018, Rondon Athayde struck the victim[2] at least forty-three times using metal curtain rods and a wooden coat hanger while they were in their shared home with their two daughters, ages three and four. As a result of the injuries that Athayde inflicted at that time and the aggravation of injuries that he had previously inflicted on the victim, the victim lost roughly two-thirds

---

[2] During police interviews, Athayde referred to the victim as his wife, but the two were not legally married.

of her blood through both internal and external bleeding, which caused her death.

[¶4]  On December 14, 2018, the State charged Athayde by complaint with intentional or knowing murder, 17-A M.R.S. § 201(1)(A).  He was later charged by indictment with intentional or knowing murder or depraved indifference murder, 17-A M.R.S. § 201(1)(A), (B).

## A.    Motion to Suppress

[¶5]  On November 4, 2019, Athayde moved to suppress statements that he made as he walked through his home with the police on December 13, 2018, and described to them, over the course of an hour and a half, what had happened.  The court held a hearing on the motion on August 27, 2020.  The only issue before the court was the voluntariness of Athayde's statements to the police at Athayde's home.

[¶6]  During the suppression hearing, the court admitted in evidence audio recordings of Athayde's police interviews and a video recording of Athayde's walk-through of his home with the police.  It also admitted transcripts of the interviews and heard testimony from three detectives about their interactions with Athayde on December 13 after his arrest.

4

[¶7]  The court entered an order on October 16, 2020, in which it found the following facts beyond a reasonable doubt.  These findings are all supported by competent evidence, including the video and audio recordings of police interviews with Athayde, which we have reviewed in full.  *See State v. Fleming*, 2020 ME 120, ¶ 25, 239 A.3d 648; *State v. Akers*, 2021 ME 43, ¶ 46, 259 A.3d 127.

[¶8]  Athayde called 9-1-1 from his home after midnight on December 13, 2018, and police arrived at about 1:00 a.m.  Athayde was placed in police custody and brought to the Oxford Police Department.  There, two detectives interviewed him beginning at 4:13 a.m.  At the outset, one of the detectives administered *Miranda*[3] warnings, and Athayde acknowledged that he understood his rights.  He was able to describe in his own words what the warnings meant.  Athayde signed a written waiver of his rights and indicated that he wanted to cooperate.

[¶9]  The officers were professional, respectful, and nonconfrontational in their interview.  They did not raise their voices, and Athayde thanked them for their treatment of him.  At times, Athayde became emotional and sobbed, overwhelmed by the enormity of the events, but he was able to refocus quickly

---

[3]  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

and describe what had happened. The detectives allowed Athayde to express his feelings, and they did not interrupt him, instead waiting for him to be able to control his feelings and continue with the conversation. The detectives frequently offered Athayde food, water, or coffee, but Athayde declined their offers, except that he did eat some crackers.

[¶10] With Athayde's consent, the detectives brought him to his home at approximately 4:24 p.m. that same day, after evidence technicians had processed the scene. One of the detectives reminded Athayde of his *Miranda* rights before beginning a walk-through. The officer informed him that he did not have to participate and could refuse to do so. Athayde indicated that he understood and that he would participate.

[¶11] In the presence of four detectives, Athayde walked from room to room describing and showing what had happened. As Athayde explained the events, the lead detective redirected him if he strayed from the subject or was unclear. The walk-through ended at about 5:53 p.m.

[¶12] During the totality of his time with the detectives, Athayde said that he had performed CPR on the victim and that it had made him tired. He said that he was fatigued and overwhelmed at times. He was in handcuffs during the walk-through; it is not clear whether he was wearing handcuffs at

the police station. Athayde did not sleep during the entire time he was with the detectives. A detective offered him the opportunity to rest, but he appeared to want to continue to speak with the detective. No bed or cot was available, and he was only able to sit in a chair or lie down on the floor. He probably had not slept since waking up on December 12.

[¶13] Athayde told the detectives that he felt sick. This feeling of illness resulted from his emotional reaction to what had happened between him and the victim, and he remained able to appreciate and understand what was happening. One of the detectives offered to call an ambulance, but Athayde declined.

[¶14] Based on these findings, the court denied Athayde's motion to suppress, concluding that, in the totality of the circumstances, Athayde made the statements during the walk-through voluntarily.

## B. Trial and Motion for Judgment of Acquittal

[¶15] The court held a jury trial on June 15, 16, and 17, 2021. The court admitted the video of the walk-through in evidence. The State did not offer any of the audio recordings from the interviews at the police station in evidence, although it did offer a detective's testimony about the interviews. At the close of the State's evidence, Athayde moved for a judgment of acquittal. The court

denied the motion. Athayde did not testify and called no witnesses in his defense.

[¶16] The jury found Athayde guilty.

## C. Sentencing

[¶17] The court held a sentencing hearing on August 31, 2021. The victim's sister and Athayde each spoke to the court, and the court heard arguments from both parties before delivering its sentence. The court considered the purposes of sentencing and conducted the requisite two-part sentencing analysis.[4] *See* 17-A M.R.S. §§ 1201(1)(A), 1252-C (2018); *State v. Bentley*, 2021 ME 39, ¶ 10, 254 A.3d 1171. Considering the nature of the crime in setting the basic sentence, the court focused on the serious domestic violence, describing it as "one of the most brutal, savage and vicious beatings" the court had seen as an attorney or judge—an assault that involved the use of hard objects, lasted for hours, and was not the first act of domestic violence that Athayde had perpetrated against the victim.[5] The court set the basic sentence at forty-five years based in part on these considerations.

---

[4] There is no third step in murder sentencing because no period of probation is authorized. *See* 17-A M.R.S. § 1201(1)(A) (2018).

[5] The testimony, photographs, and autopsy findings of the medical examiner strongly support this characterization. The medical examiner concluded that forty-three separate injuries were inflicted with metal rods and that there were roughly seventy-five additional injuries—some older than others—to the victim's head, neck, back, side, arms, legs, and pubic area. The victim had suffered a

[¶18] The court then considered aggravating and mitigating factors. The court found as mitigating factors that Athayde had no criminal history, had prior work history and education, and had cooperated with the police and expressed remorse, though he did minimize his role and misrepresented how the victim was injured. As aggravating factors, the court considered the impact on the parties' young daughters, who were present in the home throughout these events and saw or heard some of what happened, and the conscious pain and suffering of the victim during the hours of abuse. The court concluded that the aggravating factors outweighed the mitigating factors and set a maximum and final sentence of fifty years in prison. The court also ordered Athayde to pay $35 to the Victims' Compensation Fund and $3,198.47 to the Victims' Compensation Program.

[¶19] Athayde timely appealed from the judgment of conviction and successfully applied to the Sentence Review Panel for review of his sentence. 15 M.R.S. §§ 2115, 2151-2152 (2022); M.R. App. P. 2B(b)(1), 20.

---

large excoriation (loss of hair and skin) on the scalp days to weeks before her death. That injury had partially healed, but it reopened, and fresh blood in the wound showed that the victim had bled from the wound soon before her death.

## II. DISCUSSION

**A.** **Although the question is close under the Maine Constitution, the court did not err in denying Athayde's motion to suppress the video recording of his walk-through of what happened in his home.**

[¶20]  Athayde relies on both the Maine and United States Constitutions in challenging the finding that his statements made during the walk-through were voluntary.  We therefore analyze this claim applying the primacy approach.  *See State v. Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281; *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984).  This means that we first examine the merits of the state constitutional claim, independently of the federal constitutional claim.  *See Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281.  We proceed to review the application of the federal Constitution only if the state constitution does not settle the issue.  *See id.* ¶ 48; *Cadman*, 476 A.2d at 1151.  In analyzing the Maine Constitution, we consider federal interpretations of any analogous provisions of the United States Constitution only if we deem those interpretations persuasive, giving them weight similar to the weight we might give to interpretations of analogous provisions in other states' constitutions.  *See Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281.

[¶21]  We use the primacy approach for three reasons.  First, there is no federal violation if the state constitutional provision provides the relief sought

by the defendant. *See Massachusetts v. Upton*, 466 U.S. 727, 736 (1984) (Stevens, J., concurring) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law." (quotation marks omitted)). Second, we exercise judicial restraint to avoid issuing unnecessary opinions on the United States Constitution. *Cadman*, 476 A.2d at 1150 ("Just as it is a fundamental rule of appellate procedure to avoid expressing opinions on constitutional questions when some other resolution of the issues renders a constitutional ruling unnecessary, a similar policy of judicial restraint moves us to forbear from ruling on federal constitutional issues before consulting our state constitution." (citation omitted)). Third, the primacy approach enables us to satisfy our duties under our federalist system. *See* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 179 (2018) ("A state-first approach to litigation over constitutional rights honors the original design of the state and federal constitutions."); *State v. Larrivee*, 479 A.2d 347, 349 (Me. 1984) ("We must test that claim initially by

our state constitution.  That document, after all, has been the primary protector of the fundamental liberties of Maine people since statehood was achieved.").

1.    **Although a close case, Athayde's statements were voluntary under the Maine Constitution.**

a.    **The Maine Constitution requires consideration of factors internal and external to the defendant to determine voluntariness.**

[¶22]    Under the Maine Constitution, we assess voluntariness by examining both internal and external factors to determine whether a defendant's statements are the product of the free choice of a rational mind, and not a product of coercive police conduct; and whether, under all the circumstances, the admission of the statements would be fundamentally fair. *State v. Dodge*, 2011 ME 47, ¶ 12, 17 A.3d 128.

[¶23]  A challenge to the admission in evidence of a confession on the ground that the confession is involuntary implicates the right against self-incrimination contained in article I, section 6 of the Maine Constitution ("The accused shall not be compelled to furnish or give evidence against himself or herself . . . but by judgment of that person's peers or the law of the land.") and the right to due process under that same section and article I, section 6-A. *See State v. Collins*, 297 A.2d 620, 626-27 (Me. 1972) (right against self-incrimination); *State v. Heald*, 314 A.2d 820, 828-29 (Me. 1973) (same);

*State v. Caouette*, 446 A.2d 1120, 1122 (Me. 1982) (same); *Dodge*, 2011 ME 47, ¶ 11, 17 A.3d 128 (sections 6 and 6-A of article I).

[¶24]  The prohibition against the admission of involuntary statements protects multiple interests.  Excluding statements that were not made voluntarily vindicates truth-seeking by guarding against the admission of testimony that is untrustworthy or doubtful.  *See State v. Grant*, 22 Me. 171, 174 (Me. 1842) ("[A] confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it . . . ." (quotation marks omitted)); *State v. O'Donnell*, 131 Me. 294, 299 (1932) (stating that involuntary statements are inadmissible because they are "liable to be influenced, by the hope of advantage, or fear of injury, to state things which are not true"), *overruled in part on other grounds by State v. Brewer*, 505 A.2d 774, 777 & n.5 (Me. 1985).

[¶25]  Excluding involuntary statements also protects the fundamental fairness of the criminal justice system by deterring police misconduct and protecting human integrity.  *See State v. Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911 (requiring consideration of whether, even in the absence of coercion, the admission of the statements would "create an injustice"); *Collins*, 297 A.2d at

626 (stating that we "go beyond the objective of deterrence of lawless conduct by police and prosecution" to concentrate as well on "the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances" (quotation marks omitted)); *State v. Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976 (reaffirming *Collins*); *Akers*, 2021 ME 43, ¶ 47, 259 A.3d 127 (citing *Rees*).

[¶26]  Hence, even when police conduct is exemplary, a confession may be excluded to safeguard the other values protected under the Maine Constitution.  *See Collins*, 297 A.2d at 626 n.5 ("The value to which reference is now being made extends significantly beyond the deterrence of police, or prosecution, brutality or lawlessness.  There are countless instances in which official conduct in procuring the confession is exemplary, and yet the utterances of the accused, for other reasons, will not be in fact the product of his free will and rational intellect."); *e.g.*, *Rees*, 2000 ME 55, ¶¶ 2, 9, 748 A.2d 976 (affirming the suppression of statements made by the defendant based on his mental condition and not any improper police activity).

[¶27]  Additionally, to ensure the voluntariness of a confession and protection of these values, we, unlike the Supreme Court with respect to the United States Constitution, require the State to prove voluntariness beyond a

reasonable doubt to satisfy the Maine Constitution. *See Collins*, 297 A.2d at 636-37; *Heald*, 314 A.2d at 828-29; *Akers*, 2021 ME 43, ¶ 47, 259 A.3d 127; *cf. Lego v. Twomey*, 404 U.S. 477, 489 (1972) (requiring, for purposes of the United States Constitution, that the prosecution prove voluntariness by a preponderance of the evidence).

[¶28] In sum, we take care to ensure that a confession is the product of free will and intellect and untainted by pressure, either external or internal. *See also State v. Gilman*, 51 Me. 206, 215, 224-25 (1862) (opining that to be admissible, a confession must be made without compulsion, undue influence, or extortion by the exercise of inquisitorial power); *Caouette*, 446 A.2d at 1123-24 (holding, in affirming the suppression of a confession, that although "proof that a defendant's statement is spontaneous and unsolicited will often result in a finding of voluntariness, such proof does not compel a finding that the defendant was free from compulsion of whatever nature" (quotation marks omitted)); *Dodge*, 2011 ME 47, ¶ 12, 17 A.3d 128 ("If a criminal defendant challenges the voluntariness of a confession, a court must determine if the confession resulted from the free choice of a rational mind, was not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." (quotation marks omitted)); *State v. Williams*,

2020 ME 128, ¶ 42, 241 A.3d 835 (identifying the values of discouraging objectionable police practices, protecting the mental freedom of the individual, and preserving a quality of fundamental fairness in the criminal justice system).

> **b.** **In the totality of the circumstances in which Athayde made his statements, the statements were voluntary.**

[¶29] In reviewing the voluntariness of statements made to law enforcement, we review the trial court's factual findings for clear error but the ultimate determination of whether a statement should be suppressed de novo. *State v. Kierstead*, 2015 ME 45, ¶ 14, 114 A.3d 984. Neither the State nor Athayde contests the accuracy or authenticity of the audio and video recordings admitted at the suppression hearing, and we may, in our appellate capacity, listen to and view the recordings in their entirety as we review the court's findings and conclusions. *See State v. King*, 2016 ME 54, ¶ 3, 136 A.3d 366 (relying on a video recording played at a suppression hearing, in addition to the court's findings, when setting forth the facts of the case).

[¶30] To determine whether statements were voluntarily made, we look at the totality of the circumstances, including "the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats,

promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct." *Akers*, 2021 ME 43, ¶ 47, 259 A.3d 127 (quotation marks omitted).

[¶31]  Considering the totality of the circumstances reflected in the record, this is a close case.

[¶32]  Circumstances potentially suggesting involuntariness include, first, the total length of the interrogations by the police.  Athayde was handcuffed and taken into custody at approximately 1:00 a.m. on December 13. Police detectives interrogated him starting at 4:13 a.m., with a short break to fingerprint him, followed by continued questioning until 12:04 p.m., and the resumption of questioning during the ninety-minute walk-through, which began after 4:00 p.m.

[¶33]  Second, Athayde was at times highly emotional, as evidenced by him praying, feeling sick, and saying that he wanted to die.  At times he presented his narrative of events in a rambling and somewhat incoherent manner, straying from the subject.

[¶34]   Third, at the time of the walk-through—after 4:00 p.m. on December 13—Athayde probably had not slept since he awoke on the morning of December 12.[6]

[¶35]   On the other hand, the police exerted no pressure beyond taking Athayde into custody and interacting with him so that he could speak as he wished.  The detectives specifically asked him multiple times while he was in custody whether he wanted to stop.  They offered him food and drink.  They attempted to draw the interview to an end at one point, but when Athayde continued to talk, they simply continued the conversation.

[¶36]  Although Athayde was clearly emotionally distressed at times, this did not interfere with his ability to recall what had happened or to speak from the free choice of a rational mind.  *See State v. Thibodeau*, 496 A.2d 635, 640-41

---

[6] Sleep deprivation has been held to undermine the voluntariness of confessions, in no small part because it undermines the reliability of confessions.  *See Spano v. New York*, 360 U.S. 315, 322-23 (1959) (disfavoring police techniques in which "slowly mounting fatigue does, and is calculated to, play its part"); *Ashcraft v. Tennessee*, 322 U.S. 143, 153-54 (1944) (holding that a confession was not voluntary when the defendant had been held incommunicado and subjected to questioning for thirty-six hours without sleep or rest); *State v. Perea*, 322 P.3d 624, 640, 642 (Utah 2013) ("Recent laboratory-based studies have identified several factors," including sleep deprivation, "that increase the likelihood of false confessions."); Steven J. Frenda et al., *Sleep Deprivation and False Confessions*, 113 Proc. Nat'l Acad. Sci. U.S.A. 2047, 2048 (2016).  As the Supreme Court has acknowledged, "'It has been known since 1500 at least that deprivation of sleep is the most effective torture and certain to produce any confession desired.'"  *Ashcraft*, 322 U.S. at 150 n.6 (quoting Report of Committee on Lawless Enforcement of Law made to the Section of Criminal Law and Criminology of the American Bar Association (1930)); *see also* Mark Blagrove, *Effects of Length of Sleep Deprivation on Interrogative Suggestibility*, 2 J. Experimental Psych. 48 (1996); Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3, 16 (2010).

(Me. 1985).  Although he sobbed at times, crying alone does not negate the voluntariness of statements.  *State v. Durepo*, 472 A.2d 919, 921 (Me. 1984); *see also State v. Cyr*, 611 A.2d 64, 66 (Me. 1992).

[¶37]  Athayde waived his *Miranda* rights both at the start of his interview at the police station and at the beginning of the walk-through of his home.[7]  There is no argument that he lacked intellectual capacity,[8] suffered from any mental disorder, or was under the influence of any substances.  He was consistently eager to tell the authorities what had happened, and when the interview appeared to be drawing to a close, he instigated continued conversation.

---

[7] In applying article I, section 6 of the Maine Constitution, we have not, to date, made the delivery of *Miranda* warnings a requisite for a statement made in a custodial interrogation to be admissible.  *See State v. McKechnie*, 1997 ME 40, ¶ 7 n.1, 690 A.2d 976 (citing *State v. Gardiner*, 509 A.2d 1160, 1162-1163 (Me. 1986)).  That said, informing (or not informing) defendants of their right against self-incrimination has always been considered an important factor under Maine law in assessing the voluntariness of their statements or testimony.  *See State v. Gilman*, 51 Me. 206, 225 (1862) ("Great care should undoubtedly be taken to protect the rights of the accused. . . . He should be fully informed of his legal rights, when called upon or admitted to testify as a witness in a matter in which his guilt is involved."); *id.* at 223-24 ("[W]hen [a defendant] is fully apprised of his rights, and informed that he is under no legal obligation to disclose any facts prejudicial to himself, or to give evidence against himself, and then deliberately makes statements under oath, no good reason is perceived why such statements should not be given in evidence against him.  He may testify as freely as he may speak.").  A purpose of *Miranda* warnings is, notably, to counteract the presumptively coercive context of custodial interrogation.  *See Miranda*, 384 U.S. at 467-469; *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989); *Salinas v. Texas*, 570 U.S. 178, 184-85 (2013).  It follows, therefore, that the recitation of the defendant's rights followed by waivers are cogent factors supporting the conclusion that a confession is voluntary.  *See State v. Akers*, 2021 ME 43, ¶ 47, 259 A.3d 127 (listing "the recitation of *Miranda* warnings" as one consideration in the totality of the circumstances to be considered in assessing the voluntariness of a defendant's statement (quotation marks omitted)).

[8] There is evidence that Athayde told police that he had a college degree.

[¶38]   Given that the Maine Constitution rejects confessions as involuntary even in the absence of police misconduct, and that a person suspected of a serious crime is frequently emotionally agitated, there can come a point in the course of police interrogation when the police may need to cut off discussion—even when the suspect is mentally competent, has signed multiple *Miranda* waivers, and wants to keep talking—and insist that the person rest or take other steps to ensure a confession meets our high standards.  But although the duration of the interrogations, amount of sleep deprivation, and emotional state of the defendant here raise serious questions, the police were not required to terminate the conversation with Athayde under the totality of the circumstances presented.  None of the values protected under the Maine Constitution were undermined by the admission of Athayde's statements.  The circumstances surrounding his statements supply no reason to conclude that his statements are untrue: the statements were not coerced by police misconduct; he was not under any condition that negated his capacity to decide whether to speak; and his right to speak or not speak, as he chose, was protected. *See Grant*, 22 Me. at 174; *Dodge*, 2011 ME 47, ¶ 12 & n.5, 17 A.3d 128; *Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976.  The court did not err in reaching its

findings beyond a reasonable doubt and concluding that Athayde made his statements voluntarily.

### 2. Athayde's statements were also voluntary under the United States Constitution.

[¶39] Because we have concluded that Athayde's argument does not succeed under the Maine Constitution, we must review whether the statements were involuntary under the Fifth Amendment and Due Process Clause of the United States Constitution. A federal constitutional analysis of voluntariness focuses on the presence of police misconduct and not on individual characteristics or circumstances that can undermine voluntariness. *Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986). As we summarized above, we discern no police misconduct in the interviews and walk-through with Athayde. Thus, there is no violation of the United States Constitution.

## B. The court properly denied Athayde's motion for judgment of acquittal.

[¶40] Athayde contends that the court erred in denying his motion for judgment of acquittal because there was no evidence that the injuries inflicted on the victim on December 12 and 13 alone caused the victim's death and it would be improper for the jury to regard evidence of those injuries as evidence that Athayde inflicted the older injuries.

[¶41]  "We review the denial of a motion for judgment of acquittal by viewing the evidence in the light most favorable to the State to determine whether a jury could rationally have found each element of the crime proven beyond a reasonable doubt."  *State v. Adams*, 2015 ME 30, ¶ 19, 113 A.3d 583 (quotation marks omitted).

[¶42]  The medical examiner testified that the cause of the victim's death was "acute and chronic physical abuse with extensive internal and external hemorrhage."  Notwithstanding the reference to "chronic" physical abuse, he clearly testified that the "mechanism" of death was the victim's loss of two-thirds of her blood.  The exsanguination occurred on December 12 and 13, when, as the medical examiner testified, "she bled out."  The prior injuries or abuse played a role in her death because the abuse she suffered on December 12 and 13 aggravated her existing injuries, adding another source of fresh blood loss.  As with the blood loss that resulted from new injuries, the blood loss from the aggravation of the victim's previous injuries was caused by the abuse inflicted on the victim on December 12 and 13.

[¶43]  Based on the admitted evidence, the jury could rationally find that Athayde, by severely beating the victim on December 12 and 13, inflicted new

injuries and aggravated existing injuries, causing her fatal blood loss. The court did not err in denying the motion for judgment of acquittal.

## C. The court did not commit obvious error in not instructing the jury on concurrent causation.

[¶44] Athayde argues that an instruction on concurrent causation should have been delivered to the jury because there was evidence that the victim had other medical issues and there was insufficient evidence that Athayde inflicted the older injuries that contributed to her death.

[¶45] Because Athayde did not request a jury instruction on concurrent causation, we review the court's jury instructions for obvious error. *See State v. Lajoie*, 2017 ME 8, ¶ 13, 154 A.3d 132. "To prevail under the obvious error standard, [a defendant] must demonstrate that (1) there is an error, (2) that is plain, (3) that affects substantial rights, and, if so, (4) that it is error that seriously affects the integrity, fairness, or public reputation of judicial proceedings." *Id.* "In reviewing for obvious error, our ultimate task is to determine whether the defendant received a fair trial." *Id.* ¶ 15.

[¶46] To determine whether there was error, we review whether the jury instruction was generated by the evidence, *see State v. Leon*, 2018 ME 70, ¶ 1 n.1, 186 A.3d 129, reviewing the record in the light most favorable to the defendant to determine if the record would have allowed the jury to find facts

that would make concurrent causation a reasonable hypothesis. *See State v. Carrillo*, 2021 ME 18, ¶ 32, 248 A.3d 193.[9]

[¶47]  "Unless otherwise provided, when causing a result is an element of a crime, causation may be found when the result would not have occurred but for the conduct of the defendant, operating either alone or concurrently with another cause."  17-A M.R.S. § 33(1) (2018).  "In cases in which concurrent causation is generated as an issue, the defendant's conduct must also have been sufficient by itself to produce the result."  *Id.* § 33(2).  As the Legislature summarized, the relatively recent addition of subsection 2 was to provide "a simplified test to be applied in the event concurrent causation is generated as an issue.  It provides that, when a defendant's conduct may have operated concurrently with another cause, in addition to satisfying the 'but for' test the defendant's conduct must have been sufficient by itself to produce the result . . . ."  L.D. 1091, Summary, at 8 (128th Legis. 2017); *see State v. Limary*, 2020 ME 83, ¶ 31 n.6, 235 A.3d 860.

---

[9]  Although in *State v. Carrillo*, 2021 ME 18, ¶¶ 32-33, 248 A.3d 193, we considered whether the evidence generated an instruction on a *defense*, the same standard of review applies as to instructions on elements of crimes because "[t]he State's obligation to disprove a defense generated by the evidence is the functional equivalent of the State's burden to prove all of the elements of the offense," *State v. Begin*, 652 A.2d 102, 106 (Me. 1995); *see State v. Pratt*, 2020 ME 141, ¶ 12, 243 A.3d 469.

[¶48]  Here, even when viewed in the light most favorable to Athayde, the evidence does not make it a reasonable hypothesis that the victim's heart or thyroid issues caused her to exsanguinate—the event identified by the medical examiner as the cause of her death.  Nor is it a reasonable hypothesis generating a requirement to give a concurrent causation instruction that the victim's earlier injuries were caused by someone other than Athayde.  *See State v. Allen*, 606 A.2d 778, 780 (Me. 1992) (holding that when there is "no rational basis for the jury to conclude that the death resulted from any cause independent of the injuries inflicted by the defendant," a concurrent causation instruction is not required).   The  record  includes  uncontroverted  evidence  that  Athayde admitted that he had previously fought with the victim.  He said, "[T]here were other fights, but they were not violence extreme thing, you know. . . . [T]oday was totally out of control."  During the walk-through, too, Athayde alluded to previous domestic violence.  He stated that although the victim had kicked him, "she's not a bad person.  We are just like that inferno that moment that we do." Referring to lulls in the violence on December 12 and 13, he said, "that's the thing, like, the spark goes, and but most of the time we ah, ah, act together and love each other, and help each other," and "we are good at this, when we have trouble, we get together, you know?"  Finally, some of the preexisting injuries

were inflicted in personal places on the victim's body, such as her pubic bone and perineum.

[¶49]  Given this evidence and the medical examiner's testimony that fresh bleeding from the events of December 12 and 13 caused the victim's death, the omission of a concurrent causation instruction regarding the preexisting injuries did not amount to obvious error.[10]

## D.  The court did not misapply legal principles or abuse its sentencing power in setting the basic sentence.

[¶50] Lastly, Athayde argues that the court misapplied legal principles in considering a history of domestic violence in determining the nature and seriousness of the offense.  Rather, he contends, that was a factor to consider at step two of the sentencing analysis regarding the character of the individual, effect on the victim, and protection of the public interest.

---

[10]  We further note that Athayde may have made a strategic choice by *not* seeking a concurrent causation instruction.  The State submitted its proposed instructions two weeks before the trial began, and a request for an instruction on concurrent causation could have induced the State to offer additional inculpatory statements that Athayde made to police during his interviews at the police station.  For instance, from the evidence at the suppression hearing, we know that Athayde told the police, "some amount of times, ah, went out of hand, and pushing and cursing, falling and, and then ah, you hit splattering blood like," and, "we had fights, we fight, you know?"  Although we cannot say definitively from this record that Athayde made a strategic choice not to seek a concurrent causation instruction, we note that such a strategic choice—if it were apparent from the record—would preclude appellate review.  *State v. Rega*, 2005 ME 5, ¶ 17, 863 A.2d 917 ("We do not review alleged errors that resulted from a party's trial strategy."); *see also State v. Ford*, 2013 ME 96, ¶ 15, 82 A.3d 75 ("[O]bvious error review is precluded when a defendant expressly waives a jury instruction." (quotation marks omitted)).

[¶51]  We review the determination of the basic sentence de novo for misapplication of legal principles and for an abuse of the court's sentencing power.  *Bentley*, 2021 ME 39, ¶ 10, 254 A.3d 1171.  "In a murder case, the sentencing court employs a two-step process."  *Id.*  First, "the court determines the basic term of imprisonment based on an objective consideration of the particular nature and seriousness of the crime."  *Id.* (quotation marks omitted).  Next, "the court determines the maximum period of incarceration based on all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case, including the character of the offender and the offender's criminal history, the effect of the offense on the victim[,] and the protection of the public interest."  *Id.* (quotation marks omitted).

[¶52]  The court is required by statute to consider, in sentencing for murder, "[t]hat the victim is a family or household member as defined in Title 19-A, section 4002, subsection 4 who is a victim of domestic violence committed by the convicted individual."  17-A M.R.S. § 1251(2)(C) (2018); *see* 19-A M.R.S. § 4002(4) (2018) (defining "family or household members" to include "parents of the same child").  The statute does not indicate at which step in the sentencing process this fact should be considered.  Thus, a court must determine how domestic violence factors into the sentencing in the particular

case. If the murder was committed as an act of domestic violence, that is an "objective factor properly considered in the first step of the sentencing analysis." *State v. Nichols*, 2013 ME 71, ¶ 29, 72 A.3d 503; *see also State v. Sweeney*, 2019 ME 164, ¶ 18, 221 A.3d 130 (holding that in its first-step analysis, "the court properly and correctly considered the objective elements of domestic violence in the crime itself"). There may also be evidence of previous domestic violence apart from the acts constituting the crime itself. *See, e.g., id.* ¶ 19. In such circumstances, that history of domestic violence would be considered as an aggravating factor in step two of the sentencing analysis. *See id.*; *Bentley*, 2021 ME 39, ¶ 10, 254 A.3d 1171.

[¶53] Here, the domestic violence that occurred before December 12 and 13 was properly considered as part of the objective nature and seriousness of the crime itself because the cause of death articulated by the medical examiner was "acute *and chronic* physical abuse with extensive internal and external hemorrhage." (Emphasis added.) The court, in evaluating "the nature and circumstances of the crime itself," found that "this was not the first time" that Athayde had beaten the victim, who had suffered "clearly chronic injuries" that contributed to the victim's blood loss and death. The court did not misapply legal principles or abuse its sentencing power in considering the

chronic and acute domestic violence when determining the basic sentence in this case because here it was the cumulative effect of the victim's injuries that caused her blood loss and death.

The entry is:

Judgment and sentence affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Rondon Athayde

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Oxford County Unified Criminal Docket docket number CR-2018-745
FOR CLERK REFERENCE ONLY